[No. H032201. Sixth Dist. Dec. 16, 2008.]

ARCADIA DEVELOPMENT COMPANY, Plaintiff and Appellant, v. CITY OF MORGAN HILL et al., Defendants and Respondents.

## COUNSEL

Ellman Burke Hoffman & Johnson, Michael J. Burke, John D. Hoffman, Diane K. Hanna and Elizabeth L. Bridges for Plaintiff and Appellant.

Shute, Mihaly & Weinberger, Ellison Folk; and Janet C. Kern, City Attorney, for Defendants and Respondents.

## OPINION

**PREMO, J.—**

### I. INTRODUCTION

In 2004, voters in the City of Morgan Hill (City) passed a measure amending City's general plan and extending to 2020 a growth control ordinance that had been set to expire in 2010. One provision of the original ordinance drastically restricted development of certain property within the city limits (the Density Restriction). The 2004 enactment did not change the effect of the Density Restriction other than to extend it for 10 years.

Arcadia Development Company (Arcadia), which owned property subject to the Density Restriction, filed a complaint and petition for writ of mandate against City and the Morgan Hill City Council,[1] challenging the 10-year extension of the Density Restriction on equal protection and takings grounds. (U.S. Const., 14th Amend., § 1, 5th Amend.) The trial court dismissed the action, concluding that Arcadia's causes of action had accrued in 1990, when the original measure had been enacted and, therefore, that they were barred by the 90-day statute of limitations contained in Government Code section 65009.[2]

---

[1] Where applicable, further references to City are to the City of Morgan Hill and the Morgan Hill City Council, collectively.

[2] Further unspecified section references are to the Government Code.

We conclude that under the circumstances of this case the 2004 measure extending the Density Restriction for 10 years gave rise to a new cause of action and, therefore, that Arcadia's lawsuit was timely. Accordingly, we shall reverse.

## II. FACTS

City is located in the southern portion of the Santa Clara Valley. In 1970, City had a population of fewer than 6,000 people. In the mid-1970's the population was growing at a rate of about 20 percent per year. In or about 1977, in response to this rapid growth, City's voters approved Measure E, which imposed City's first residential development control system (RDCS), a method by which City distributed a limited number of housing allotments among those seeking to develop property within City's borders. Measure E remained in effect until 1990 when voters passed Measure P. Measure P placed additional limits upon City's rapid rate of growth, which, for the years 1985 through 1990, was the highest in the county. Measure P continued the housing allotment system first implemented by Measure E and set a population target of 38,800 for 2010.

In addition to its purpose of limiting growth, Measure P was designed to concentrate residential growth toward the center of the city and prevent the outward sprawl that put excessive pressure on city services. In order to advance this purpose, Measure P prohibited City from adding any more land to its urban service area, other than "desirable in-fill," until such time as the city council found that developable land already within City's borders was insufficient to accommodate five years of residential growth. Measure P also introduced the Density Restriction, which was expressly intended to limit development of properties annexed between March 1, 1990, and the effective date of Measure P (Dec. 8, 1990).[3] The properties subject to the Density Restriction were the properties being considered for annexation by the Santa Clara County Local Agency Formation Commission (LAFCO) around the time Measure P was being drafted. They were located on the outskirts of City's borders, which meant that developing the properties would contribute

---

[3] The Density Restriction was codified as section 18.78.070.D. in City's municipal code, and provided, in pertinent part: "Because of the shortage of services and resources facing the city . . . and in order to assure that such services and resources are not unduly burdened further, urban sprawl and noncontiguous development must be discouraged. Therefor [sic], for any land added to the urban service area between March 1, 1990, and the effective date of [Measure P] and not considered in-fill . . . the city shall not provide urban services to support any development at a higher density than is provided for in the Santa Clara County general plan as of March 1, 1990."

to the urban sprawl Measure P was designed to prevent. The Density Restriction limited development on these properties to the density allowed by the Santa Clara County general plan to which they would have been subject absent annexation, effectively preventing them from competing for housing allotments at the much greater density City's zoning regulations would have allowed. Measure P became effective on December 8, 1990, and, by its terms, is set to expire in 2010.

Arcadia owned one of the properties awaiting annexation approval when Measure P was being drafted. Arcadia's property consisted of approximately 80 acres in the rural area of Santa Clara County, just outside City's borders. LAFCO approved its annexation on March 19, 1990, which placed the property squarely within the timeframe to which the Density Restriction was to apply. On September 19, 1990, within the window of time between annexation of its property and passage of Measure P, Arcadia was awarded a housing allotment for an 11-acre subdivision of its parcel. City approved Arcadia's plans for the subdivision in 1991 with the condition that "no further subdivision and or residential development of the [remaining 69 acres] shall be allowed except in accordance with the provisions contained in [City's RDCS] (Chapter 18.78 of the Morgan Hill Municipal Code) as amended." The Density Restriction, which was part of the RDCS, limited development of Arcadia's 69-acre remainder parcel to a maximum of one unit per 20 acres, or a total of four homes. Absent the Density Restriction, the RDCS would have allowed Arcadia to compete for housing allotments at a density of five units per acre, or approximately 345 homes.

There were two other parcels in addition to Arcadia's that were potentially subject to the Density Restriction. One was a 33-acre parcel known as the Half Road-Grattan property and the other a 14-acre parcel known as the Watsonville-Tersini property. At the time of its annexation, the Half Road-Grattan property was designated for industrial development so that unless it was rezoned the RDCS did not apply to it at all. The Watsonville-Tersini property was designated residential and, therefore, was subject to the RDCS. However, like Arcadia, the Watsonville-Tersini property received housing allotments after it was annexed but before the effective date of Measure P. Those allotments effectively built out that 14-acre parcel. Thus, by the time Measure P took effect, Arcadia's property was, for all practical purposes, the only property to which the Density Restriction applied.

In early 2002, City began considering amendments to Measure P. In biweekly meetings, from July 2002 until May 2003, the Measure P Update Committee met to consider revisions to the RDCS. Among other things, City

planned to extend the duration of the RDCS for an additional 10 years. During this planning phase, Arcadia had urged City to do away with the Density Restriction. Arcadia maintained that the restriction unfairly singled out Arcadia's property because there was no reasonable basis upon which to differentiate Arcadia's property from other developable property within the city limits. Arcadia was also concerned that the restriction would become a perpetual limit upon development of its property. City considered three ways of dealing with the Density Restriction. It could extend the restriction along with the rest of the RDCS to 2020, delete it, or allow it to expire in 2010 as it would have under Measure P. City chose to extend it to 2020.

The new measure, designated as Measure C, was put to the voters pursuant to a resolution adopted by City at the conclusion of the public hearing on November 19, 2003. Measure C set a population target of 48,000 for 2020, continued, with some refinements, the housing allotment system, continued to prohibit annexation of other than "desirable in-fill" until City had insufficient land available to accommodate five years of growth, and continued the Density Restriction in substantially the same form it had appeared in Measure P.[4] The voters approved Measure C and it became effective on April 17, 2004. Thus, the Density Restriction was continued in effect until 2020.

III. PROCEDURAL BACKGROUND

Arcadia filed this lawsuit on May 28, 2004. The first cause of action was a petition for writ of mandate. (Code Civ. Proc., § 1085.) Arcadia maintained that City's approval of Measure C, to the extent it included the Density Restriction, was a prejudicial abuse of discretion that imposed an arbitrary and unreasonable condition upon the development of Arcadia's property, causing it new and additional harm beyond that caused by Measure P. The second cause of action was for inverse condemnation and alleged that the Density Restriction constituted a taking of the property for public use without just compensation and that it "frustrate[d] Arcadia's reasonable investment-backed expectations for the use of the Property." The third and fourth causes of action sought damages for denial of equal protection and violation of civil

---

[4] Measure C made small, nonsubstantive changes to the Density Restriction. Section 18.78.070.D. of City's municipal code now provides: "In order to assure that city services and resources are not unduly burdened, urban sprawl and noncontiguous development must be discouraged. Therefor, for any land added to the urban service area between March 1, 1990, and the effective date of Measure P, December 8, 1990, and not considered infill as defined in subsection B of this section, the city shall not provide urban services to support any development at a higher density than that provided for in the Santa Clara County general plan as of March 1, 1990."

rights. (42 U.S.C. §§ 1983, 1988.) The gist of these claims was that the Density Restriction unfairly singled out Arcadia's property and was arbitrary and unreasonable. The pleading also requested a judicial declaration that the Density Restriction was illegal and unconstitutional.

To streamline the proceedings, the trial was bifurcated with the writ petition and the liability portion of the equal protection cause of action to be determined first, leaving all other issues to a second phase. The parties agreed that the trial court should make a determination of the statute of limitations question prior to reaching the merits of the claims to be tried in phase one. The trial court had previously overruled City's demurrer on the statute of limitations issue, concluding that it could not decide based upon the face of the pleading whether or not the statute had run. The issue was extensively briefed and tried upon documentary evidence submitted by the parties.

Following the phase one trial the court issued a brief order finding the statute of limitations to be dispositive. The judgment, entered August 31, 2007, stated, "Arcadia's petition and complaint is barred by the statute of limitations set forth in Government Code section 65009. The statute of limitations began to run on December 8, 1990, when Measure P became effective. Pursuant to the reasoning of *De Anza Properties X, Ltd. v. County of Santa Cruz* (9th Cir. [1991]) 936 F.2d 1084, the adoption of Measure C did not restart the statute of limitations." Arcadia has timely appealed.

## IV. Contentions on Appeal

The parties agree that the instant action is governed by section 65009, subdivision (c)(1)(B), which provides a 90-day statute of limitations for facial challenges to a zoning ordinance. Arcadia argues that its action is timely because the 10-year extension of the Density Restriction caused it "new and substantial harm by effectively excluding Arcadia from competing for development allotments under City's RDCS during the 10-year period from 2010 to 2020." City responds that since the Density Restriction was enacted in 1990 and Measure C merely extended its duration, Arcadia's challenge is untimely under section 65009. City argues in the alternative that Arcadia's consent to the condition imposed upon its 1991 project bars the current action both on statute of limitations (§ 66499.7) and collateral estoppel grounds.

## V. Discussion

### A. Standard of Review

Where the pertinent facts are undisputed, it is a question of law whether a case is barred by the statute of limitations. Accordingly, we apply the de novo

standard of review. (*Pugliese v. Superior Court* (2007) 146 Cal.App.4th 1444, 1448 [53 Cal.Rptr.3d 681].)

*B. Analysis*

1. Section 65009

■ Section 65009 imposes a relatively short statute of limitations on legal challenges to local land use decisions. (§ 65009, subd. (a)(2).) It does so in order to " 'provide certainty for property owners and local governments regarding decisions made pursuant to this division' (§ 65009, subd. (a)(3)) and thus to alleviate the 'chilling effect on the confidence with which property owners and local governments can proceed with projects' (*id.*, subd. (a)(2))." (*Travis v. County of Santa Cruz* (2004) 33 Cal.4th 757, 765 [16 Cal.Rptr.3d 404, 94 P.3d 538].) Section 65009, subdivision (c)(1)(B), provides that "no action or proceeding shall be maintained" in any action challenging "the decision of a legislative body to adopt or amend a zoning ordinance" unless "the action or proceeding is commenced and service is made on the legislative body within 90 days after the legislative body's decision."[5] The 90-day limitations period begins to run on a facial challenge to a zoning ordinance on the date the ordinance becomes effective. (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22 [32 Cal.Rptr.2d 244, 876 P.2d 1043].)

■ Arcadia argues that since section 65009 provides the time limit for challenging a decision to amend an ordinance, and since this suit challenges a decision to amend, then the suit must be timely. But section 65009 merely

---

[5] Section 65009 provides, in pertinent part:

"(a)(1) The Legislature finds and declares that there currently is a housing crisis in California and it is essential to reduce delays and restraints upon expeditiously completing housing projects.

"(2) The Legislature further finds and declares that a legal action or proceeding challenging a decision of a city, county, or city and county has a chilling effect on the confidence with which property owners and local governments can proceed with projects. Legal actions or proceedings filed to attack, review, set aside, void, or annul a decision of a city, county, or city and county pursuant to this division, including, but not limited to, the implementation of general plan goals and policies that provide incentives for affordable housing, open-space and recreational opportunities, and other related public benefits, can prevent the completion of needed developments even though the projects have received required governmental approvals.

"(3) The purpose of this section is to provide certainty for property owners and local governments regarding decisions made pursuant to this division. [¶] . . . [¶]

"(c)(1) Except as provided in subdivision (d), no action or proceeding shall be maintained in any of the following cases by any person unless the action or proceeding is commenced and service is made on the legislative body within 90 days after the legislative body's decision: [¶] . . . [¶]

"(B) To attack, review, set aside, void, or annul the decision of a legislative body to adopt or amend a zoning ordinance."

states that "no action" challenging such a decision may be maintained after the expiration of 90 days, which is not the same thing as saying that *any* action challenging an amendment may be brought within 90 days of the amendment. Section 65009 does not create the cause of action. It merely limits the period of time within which a cause of action may be prosecuted. Certainly, where a cause of action is barred by the doctrine of res judicata, section 65009 would not operate to revive the claim. (See, e.g., *Tahoe Sierra Pres. Council v. Tahoe Reg. Planning* (9th Cir. 2003) 322 F.3d 1064, 1084 (*Tahoe Sierra*).) The same is true for a cause of action that is barred by the statute of limitations. Since a statute of limitations begins to run upon the accrual of a cause of action (Code Civ. Proc., § 312), the pertinent question is, when did Arcadia's causes of action accrue? Since Measure C took effect in April 2004, Arcadia's lawsuit filed in May 2004 would be timely only if its causes of action accrued with the enactment of Measure C.

The general rule is that a cause of action accrues " 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.' [Citation.] In other words, [accrual] sets the date as the time when the cause of action is complete with all of its elements." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 [87 Cal.Rptr.2d 453, 981 P.2d 79].) Arcadia concedes that causes of action like those alleged in its current pleading accrued in 1990, when City first enacted the Density Restriction. Arcadia argues, however, that extending the Density Restriction for an additional 10 years was a separately actionable wrong and that the causes of action alleged in this case arose only when those 10 years were added to the ordinance.

In our view, the question is best analyzed by determining whether there is a factual basis for distinguishing between City's 1990 decision to adopt the Density Restriction and the 2004 decision to continue the restriction for an additional 10 years. (Cf. *De Anza Properties X, Ltd. v. County of Santa Cruz, supra,* 936 F.2d at p. 1086 (*De Anza*).) This analysis is illustrated by *Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 703 [37 Cal.Rptr.3d 149, 124 P.3d 719] (*Barratt*), in which our Supreme Court determined that reenactment of certain development and building fees gave rise to a new cause of action even though the reenactment merely extended the duration of an existing fee schedule.

In *Barratt*, the trial court found that the plaintiff's challenge to the reenactment of a building fee schedule was barred by section 66022, subdivision (a), which imposes a 120-day period of limitations for any action

challenging such fees. According to the trial court, the cause of action had arisen when the fee schedule was first enacted. (*Barratt, supra,* 37 Cal.4th at p. 692.) The Supreme Court disagreed. Under the applicable statutes, the city could not impose fees that exceeded the estimated reasonable costs of providing the services for which the fees were charged and it had to apply any excess revenue collected to reduce fees in the future. (*Id.* at p. 691.) By reenacting the ordinance without changing the amount of the fees the city was implicitly representing that the existing fee schedule met those statutory standards. (*Id.* at p. 703.) The factual predicate for each reenactment had to be reevaluated each time. If the plaintiff were barred from challenging the reenactments, "then the validity of all subsequent reenactments would be immune to judicial challenge or review." (*Ibid.*) Accordingly, the Supreme Court held that the statute of limitations began to run anew with each new fee schedule. (*Ibid.*)

■ City distinguishes *Barratt* on the ground that statutory requirements like those at issue in *Barratt* are not present here. While there is no similar statutory requirement in this case, *Barratt*'s reasoning is applicable. Arcadia's entire lawsuit is based upon two constitutional principles, equal protection and takings. Equal protection requires "that persons *similarly situated* with respect to the legitimate purpose of the law receive like treatment." (*College Area Renters & Landlord Assn. v. City of San Diego* (1996) 43 Cal.App.4th 677, 686 [50 Cal.Rptr.2d 515].) In order to prove an equal protection violation, Arcadia would have to show that the Density Restriction discriminates and that the discrimination does not bear a rational relationship to a legitimate state purpose. "Under the traditional, rational relationship test, the court conducts an inquiry into the correspondence between the classification and the legislative goals. [Citation.] A zoning ordinance may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." (*Ibid.*) It follows that City's purpose and the surrounding circumstances are matters that bear upon Arcadia's equal protection challenge to the 10-year extension of the Density Restriction.

City's stated purpose for continuing the Density Restriction was the same in 2004 as it was when the restriction was first enacted in 1990, namely, to encourage development in the center of the city. It is clear, however, that City did not intend the 1990 Density Restriction to be permanent. City expected that growth would continue and that changing circumstances would drive future growth control decisions. Measure P expressly acknowledged

that, given City's anticipated growth, the ban on annexations would eventually be lifted. By implication, Measure P also presumed that at some point the Density Restriction would have to be revised or eliminated as development pushed up against City's 1990 borders.[6] In short, Measure P's original 20-year expiration date and its stated goals and policies confirm that Measure P and the included Density Restriction were intended to be temporary measures. The temporary nature of the original restriction meant that any decision extending the Density Restriction would have to be based upon then existing circumstances such as the amount and location of the intervening growth. Thus, whether City decided to revise the restriction, amend it, or allow it to expire, the factual basis for the decision would be different than the factual basis for the 1990 decision.

City argues that the statute of limitations could not have been triggered by the 2004 amendment because the circumstances had not changed by 2004; City had not been built out and still had sufficient land within its urban service area so that no further annexations were needed to accommodate growth. But while the argument may be relevant to Arcadia's substantive claim, it is not relevant to the statute of limitations question. In order to decide in 2004 whether excluding Arcadia's property from competition for housing allotments would continue to advance City's goals of limiting and directing growth, City had to evaluate the location and amount of growth that had occurred in the past 14 years in relation to Arcadia's property. In deciding to extend the restriction for 10 more years, City implicitly determined that the circumstances supporting the adoption of the restriction in 1990 had not dissipated and that the restriction was still rationally related to City's growth control and antisprawl purposes.[7] As in *Barrett*, although the result was the same, the issue had to have been decided upon the circumstances as they existed when the law was extended.

[6] The trial court's inquiry of City's counsel during the trial demonstrated that City understood that the existing Density Restriction would someday give way to allow additional development on Arcadia's property. After establishing that the Arcadia property would have been limited to the 20-acre lot size whether the owner sought to develop the property in 1990 or in 2004, the court asked: "And when could [the owner] hope realistically to get a different answer?" Counsel replied, "I think the rational answer is that when the City has reached its five year—it's within its five-year inventory because at that point then the City's policy would allow the City to annex properties that are—don't qualify as desirable infill. So the Arcadia property at that point—*I think the City would have an obligation to allow the Arcadia property to develop at that point* because he then—the City's in the situation where they've reached their policy goal of developing more of their interior before allowing for the expansion where they can actually add lands that don't qualify as desirable infill in which case the property could be developed." (Italics added.)

[7] Indeed, City kept a parcel-by-parcel inventory to track which properties were developed and with that information in hand, City specifically considered whether the Density Restriction was still necessary when it planned the revisions to Measure P.

■ The temporary nature of the 1990 restriction also means that extending it for 10 additional years was a new burden upon the Arcadia property, triggering a new inverse condemnation claim. Arcadia's inverse condemnation cause of action alleged a regulatory taking as opposed to a taking based upon the actual physical occupation of or damage to real property. Where a regulatory taking is alleged, "compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." (*Yee v. Escondido* (1992) 503 U.S. 519, 522–523 [118 L.Ed.2d 153, 112 S.Ct. 1522].) Arcadia alleges the type of regulatory taking that is analyzed pursuant to the *Penn Central* line of cases. (*Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 [57 L.Ed.2d 631, 98 S.Ct. 2646].) The *Penn Central* analysis requires consideration of several factors "including the regulation's economic impact on the claimant, the extent to which it interferes with distinct investment-backed expectations, and the character of the government action." (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 528–529 [161 L.Ed.2d 876, 125 S.Ct. 2074].) The aim is to identify regulatory actions that are "functionally equivalent to a direct appropriation of or ouster from private property" by focusing upon "the severity of the burden that government imposes upon property rights." (*Id.* at p. 529.) The duration of the regulation is one of the important factors that a court must consider in determining the severity of that burden. (*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 342 [152 L.Ed.2d 517, 122 S.Ct. 1465].)

City urges us to follow the reasoning of *De Anza, supra*, 936 F.2d 1084, upon which the trial court relied below. *De Anza* was a challenge to a county's mobilehome rent control ordinance. One issue on appeal was whether the takings cause of action had accrued in 1982 when the ordinance was passed or in 1987 when the county amended the ordinance to delete its sunset provision. (*Id.* at p. 1086.) *De Anza* held that since the plaintiffs had suffered the same injury from the date the ordinance was passed, no new cause of action accrued when the ordinance was reenacted without the sunset provision. According to the *De Anza* court, such a "durational change" may affect the plaintiffs' damages but it did not affect accrual of the cause of action. (*Id.* at pp. 1086–1087.)

*De Anza* is inapplicable to this case because it arose in a different legal context. *De Anza* was based upon that court's decision in *Hall v. City of Santa Barbara* (9th Cir. 1986) 833 F.2d 1270, 1276, in which it was held for the first time that a rent control ordinance could be considered an actual physical occupation of property and, therefore, might be an unconstitutional taking. A physical occupation of property is a per se taking for purposes of the Fifth Amendment. (*Lingle v. Chevron U.S.A. Inc., supra*, 544 U.S. at p. 538.) The

duration of the physical occupation would be relevant to the plaintiff's damages, but a takings cause of action based upon physical occupation would always be complete when the property was first occupied. The same is not true of the instant type of regulatory takings challenge, which is not evaluated in a per se manner but depends upon a more complex factual analysis.[8]

It is true that extending the Density Restriction for 10 additional years increased the burden upon Arcadia such that one could argue that the action affected only Arcadia's damages. But since the 1990 restriction was intended to be temporary, extending it for 10 additional years was also a *new* burden. Indeed, if Arcadia were precluded from challenging any extension of the Density Restriction, City could annex more property and allow development around and beyond Arcadia's property while continuing to restrict development on Arcadia's property. City could turn a temporary restriction into a permanent restriction, singling out one landowner to bear the entire burden, and the landowner, who was willing to accept a temporary restriction, would be forced to endure a permanent restriction and would have no remedy.

*Tahoe Sierra, supra,* 322 F.3d 1064, upon which City also relies, is distinguishable. *Tahoe Sierra* involved a comprehensive regional land use plan and land classification system issued by the regional planning agency in 1987. Similar to City's housing allotment system, the 1987 plan at issue in *Tahoe Sierra* was a system that rated the relative suitability of undeveloped parcels for residential development. (*Id.* at p. 1071.) The plan provided that the planning agency was to conduct an annual review to determine whether to revise the classification of the land subject to the plan. (*Id.* at p. 1072.) The plaintiff challenged the planning agency's classification decisions made pursuant to the plan. (*Id.* at p. 1075.) The appellate court held that the claims "could and should have been raised" in the plaintiffs' earlier pleadings attacking the plan, and, therefore, that the claims were precluded by the doctrine of res judicata. (*Id.* at p. 1076.) In this case, Arcadia is not challenging City's implementation of an existing land use scheme, it is challenging a new plan.

City cites a footnote in *Tahoe Sierra,* in which the court noted, in effect, that an equal protection claim arises when the unequal treatment becomes apparent. (*Tahoe Sierra, supra,* 322 F.3d at p. 1080, fn. 15.) The point had been raised because the plaintiff had belatedly complained that the planning

---

[8] Since we conclude that *De Anza* is inapplicable, the several federal cases City cites, which relied upon the *De Anza* holding, are likewise inapplicable. (See, e.g., *Action Apartment Ass'n v. Santa Monica Rent Contr.* (9th Cir. 2007) 509 F.3d 1020; *State of Alaska v. U.S.* (1995) 32 Fed.Cl. 689.) We also note that there is some doubt that *De Anza* is still viable law. (See *Azul-Pacifico, Inc. v. City of Los Angeles* (9th Cir. 1992) 973 F.2d 704, 705 (conc. & dis. opn. of Kozinski, J.).)

agency treated California and Nevada parcels differently. The court explained that the inequality was enshrined in the 1987 plan and that the agency was merely implementing that plan when it made the later decisions that the plaintiff was challenging. The equal protection challenge was not viable because it could have and should have been raised in the prior litigation between the parties. (*Ibid.*) It is true that in this case the inequality of which Arcadia complains existed in 1990. What makes this case different is that City decided anew in 2004 to continue the inequality based upon circumstances as they existed in 2004.

We also find *Buena Park Motel Assn. v. City of Buena Park* (2003) 109 Cal.App.4th 302 [134 Cal.Rptr.2d 645], inapplicable. In that case, the plaintiffs challenged two ordinances. The first was an ordinance restricting motel stays to less than 30 days. (*Id.* at pp. 305–306.) The second, passed three years later, retained the less-than-30-day limit and added additional restrictions. (*Id.* at p. 306.) The plaintiffs challenged both ordinances but the appellate court held that, pursuant to the 90-day limit of section 65009, the plaintiffs were barred from challenging the first ordinance "and those portions of the related city code provision which were not altered by the later ordinance." (*Buena Park Motel Assn. v. City of Buena Park, supra*, at p. 308.) Here, Arcadia is not challenging the first ordinance. Arcadia is challenging the Density Restriction in the second ordinance, which *was* an alteration of the first ordinance.

Our conclusion that Arcadia's claims are not barred by the statute of limitations is not inconsistent with the purposes inherent in any statute of limitations. The fundamental purpose of a statute of limitations is to prevent litigants from asserting stale claims once evidence is no longer fresh and witnesses are no longer available. (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1114 [56 Cal.Rptr.3d 880, 155 P.3d 284]; *Davies v. Krasna* (1975) 14 Cal.3d 502, 512–513 [121 Cal.Rptr. 705, 535 P.2d 1161].) Arcadia's is not a stale claim for which City must rely upon faded memories or lost evidence. The claim concerns only the extension of the 1990 ordinance as considered in detail by City during the study period immediately preceding the 2004 enactment.

Nor does our decision conflict with the express purpose of section 65009, which is to provide certainty for property owners and local governments regarding decisions like the zoning ordinance before us. (§ 65009, subd. (a)(3).) It is true that by insulating local government decisions after the expiration of 90 days section 65009 promotes sound fiscal planning by government entities. (*Hensler v. City of Glendale, supra*, 8 Cal.4th at p. 27.) But the planning that resulted in the extension of the Density Restriction took place immediately prior to the enactment of Measure C in 2004, not in 1990

as City suggests. Furthermore, since section 65009 is also intended to provide certainty for property owners, we would only add to the property owner's uncertainty if we held that the owner could not challenge the extension of an ordinance that was represented as a temporary measure when it was first passed.

■ Our decision should not be read as holding that any renewal of an existing ordinance gives rise to a new cause of action. Our decision is based upon the facts of this case, which show that City recognized that the Density Restriction, as originally enacted, was intended to be temporary and that it would be lifted when circumstances changed. City's 2004 decision changed the impact of the restriction upon Arcadia's property based upon circumstances that existed in 2004. That impact and the 2004 circumstances must be considered in assessing the validity of Density Restriction under the equal protection and takings theories of this case. Measure C's 10-year extension of the Density Restriction was a substantive change, which City and its voters considered and decided anew when Measure C was approved in 2004. It follows that Arcadia may challenge the 10-year extension of the Density Restriction, even though Arcadia is barred from challenging the original 20-year restriction.

### 2. Section 66499.37

■ City argues in the alternative that Arcadia's claims are barred by the provisions of section 66499.37. Section 66499.37[9] establishes a 90-day period of limitations within which to challenge the application of a regulation to a specific piece of property. (*Hensler v. City of Glendale, supra,* 8 Cal.4th at p. 23.) City points out that the condition it imposed upon Arcadia's development of 11 acres in 1991 stated that, "[N]o further subdivision and or residential development of the remainder parcel shall be allowed except in accordance with the provisions contained in [City's RDCS] . . . ." According to City, Arcadia's failure to challenge this condition within 90 days bars its current challenge. But in 1991, the RDCS, which contained the Density Restriction, was set to expire in 2010. If Arcadia consented to any restrictions upon the development of its 69 remaining acres, it was to this 20-year restriction. The 10-year extension of the ordinance that Arcadia challenges here did not exist in 1991.

---

[9] Section 66499.37 provides, in pertinent part, that "Any action or proceeding to attack, review, set aside, void, or annul the decision of an advisory agency, appeal board, or legislative body concerning a subdivision . . . or to determine the reasonableness, legality, or validity of any condition attached thereto" must be brought within 90 days after the date of the decision.

## VII. DISPOSITION

The judgment of dismissal is reversed.

Rushing, P. J., and Duffy, J., concurred.