[No. H035519. Sixth Dist. Aug. 5, 2011.]

ARCADIA DEVELOPMENT COMPANY, Plaintiff and Appellant, v.
CITY OF MORGAN HILL et al., Defendants and Respondents.

1528

COUNSEL

SSL Law Firm, Michael Burke and Diane K. Hanna for Plaintiff and Appellant.

Shute, Mihaly & Weinberger and Ellison Folk for Defendants and Respondents.

OPINION

PREMO, J.—

## I. INTRODUCTION

Plaintiff Arcadia Development Company (Arcadia) is the owner of an undeveloped 69-acre parcel of land annexed by defendant City of Morgan Hill (City) in 1990. Under City's general plan the Arcadia property is zoned R-1 (7000), which allows single-family residential developments on lots as small as 7,000 square feet. Notwithstanding its general plan designation, the Arcadia property is limited by a City ordinance known as the "Density Restriction" to 20-acre lots. The Density Restriction applies only to the Arcadia property and to no other property within City's urban service area. The question in this appeal is whether the Density Restriction is an invalid exercise of City's police power or a violation of Arcadia's right to equal protection of the law. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) We conclude that there are conceivable rational reasons for the restriction and, therefore, that the ordinance is valid.

## II. FACTS

City is situated in the southern portion of Santa Clara County in the flatlands of the Santa Clara Valley about 20 miles south of San Jose. The Diablo Mountain Range is to City's east; the Santa Cruz Mountains are to its west; Monterey Road runs in a roughly north/south direction down the middle, bisecting City's central core. Highway 101 runs parallel to and east of Monterey Road.

City is most heavily developed to the west of Highway 101. City's urban service area extends east of Highway 101 in two irregularly shaped branches. The Arcadia property is a rectangular parcel that lies midway along the southern edge of the southern branch, about a mile east of Highway 101 and two miles east of City's central core. The property juts out from this southern branch of the urban service area such that its western and southern borders

abut county land. The land immediately to its west is unincorporated rural property, some of which is considered prime agricultural land. The land to its south is also agricultural. The Arcadia property has been cultivated for many years and most recently has been used for dryland farming. It is improved with one or two residences and a few scattered agricultural structures. The land to the north and east of the Arcadia property lies within City's urban service area and is developed with single-family homes.

Arcadia first requested annexation of what was then an 80-acre parcel in 1986. Because City already had a surplus of residentially developable land within its urban service area, City staff recommended denying the request. Nevertheless, City asked the Santa Clara County Local Agency Formation Commission (LAFCO) to consider it. The 1989 environmental impact report (EIR) prepared at LAFCO's request found that development of the Arcadia property would be contiguous with and a logical extension of existing development. Development of the property would also "expand the fringes of the City outward, while there is more than [an] adequate supply of developable land within the [urban service area]." Development "could have the adverse effect of hastening development of the agricultural and open space lands to the south and west rather than protecting or retarding growth in those areas." Despite these concerns, and in the face of neighborhood opposition, LAFCO ultimately approved the request and the Arcadia property was added to City's urban service area on March 19, 1990.

Meanwhile, City voters concerned about rapid growth had been drafting an initiative (Measure P) to halt expansion of City's urban service area. During the 1970's, City experienced a period of explosive population growth, which led City to adopt a residential development control system (RDCS) under which City granted housing allotments for new residential developments pursuant to a formula designed to control the quality, type, distribution, and quantity of new residential housing. But in spite of the enactment of the RDCS, City's population continued to grow, prompted largely by the growth of Silicon Valley in the 1980's. As a result, the pressure to expand City's urban service area increased. A glut of annexation requests like Arcadia's came in the late 1980's. City approved six applications between 1986 and 1987, adding 379 acres. City considered 10 more applications in 1988, ultimately approving four of them and adding another 300 acres. By 1990, City's general plan designated 997 acres as vacant and zoned for residential development. Since City absorbed about 50 acres per year, that meant that City had enough residentially developable land for about 20 years of growth. Measure P proposed to amend the RDCS to limit further extension of the urban service area.

The proposed Measure P included "Findings and Purposes," several portions of which are pertinent here. One finding was, "The indiscriminate

continued expansion of the city and urban service area boundaries further imbalances the jobs to housing ratio . . . , adversely affects the city's ability to maintain its level of services, can adversely affect the quality of life in the city, and is not necessary to meet the city's fair share of regional growth." Another finding was that "leapfrog" development of land outside City boundaries, as well as within the City "adversely affects the city's level of services and quality of life." Development on property that is "not contiguous with existing developed land, contributes to urban sprawl, and can reduce the vitality of the city's urban center. Such leapfrog development should be discouraged, as it is an inefficient way to develop, and [im]poses greater burdens on the community than 'in-fill' development with[in] the city's existing urban service area."

Based on these findings, the initiative declared: "The people of Morgan Hill are therefor opposed to any further expansions of the city and its urban service area until such time as expansion is needed to support projected growth for the next five years. . . . [¶] . . . [¶] The unique character of the city depends on its rural surroundings. In order to maintain this rural atmosphere, provide a buffer against development and preserve a greenbelt legacy for future generations, the city must take steps to preserve open space and agricultural lands and public parklands in and around the city." And finally, "Because city services such as water are finite and limited, and because development on the outskirts of the city causes the delivery of needed services to be more expensive and difficult, the rate of population growth of Morgan Hill should not be increased when lands are added to the city or its urban service area."

Measure P addressed the foregoing concerns by prohibiting any further addition of land to City's urban service area until City's inventory of residentially developable land was insufficient to meet five years' growth. The only exception to the prohibition would be where the land qualified as desirable infill, defined as a parcel of 20 acres or less, abutting City on at least two sides, or abutted on one side by City and having two other sides within a quarter-mile from a City boundary.

Measure P, which was to go before the voters in November 1990, also introduced the Density Restriction. The Density Restriction provided that properties added to the urban service area between March 1, 1990, and the effective date of Measure P could not be developed at a density greater than that allowed by the county general plan to which the property would have been subject absent its annexation. The express purpose of the provision was to discourage "urban sprawl and noncontiguous development" in order to assure that "City services and resources are not unduly burdened." The drafters reportedly chose March 1, 1990, as the cutoff date in order to

discourage a rush of annexations, which they feared might occur once the initiative's provisions were made public.

Measure P was approved and went into effect on December 8, 1990. By then the Arcadia property had been added to City's urban service area and Arcadia had received housing allotments for 11 acres on its eastern border. The remaining 69-acre parcel was subject to the Density Restriction. Under the zoning designation of City's general plan, Arcadia would have been eligible to compete for up to 345 homes on this parcel; under the Density Restriction it was limited to about four homes. There were two other properties added to City's urban service area during the nine-month period between March 1, 1990, and the effective date of Measure P but these were not subject to the Density Restriction; one was industrially zoned and the other was fully developed. Thus, the Arcadia property was the only residentially developable property within City's urban service area that could not compete for housing allotments at the density allowed by its general plan zoning designation.

Measure P was set to expire in 2010. Beginning in early 2002, City began considering updating the measure and extending it to 2020. City found that Measure P had been successful in directing growth to areas that were contiguous with existing development and served by adequate infrastructure. Most City residents favored restricting rather than expanding development. Critical goals of the Measure P update were simplification of the development review process and the continued encouragement of efficient patterns of development.

Arcadia urged City to do away with the Density Restriction, arguing that the restriction unfairly singled out its property. During public hearings on the issue City staff, planning commissioners, and members of the public acknowledged that the Arcadia property was the only property subject to the Density Restriction. Some questioned the legality or the necessity of continuing the restriction. City considered deleting it or allowing it to expire in 2010 as it would have under Measure P. It was acknowledged, however, that deleting the provision might "cost votes." Indeed, development of the Arcadia property was the main concern expressed by participants at the community workshop conducted in connection with the proposed update.

In its final version of the updated measure (Measure C), City chose to extend the Density Restriction to 2020. Measure C set a new population target, continued the housing allotment system, and continued to prohibit annexation of land other than "desirable infill" until City had insufficient land available to accommodate five years of growth. In fact, City had not added any noninfill land to its urban service area since the addition of the Arcadia

property in 1990. Even so, by 2004 City had 1,056 acres available for residential development, enough to last approximately 21 years.

Measure C was approved and became effective on April 17, 2004. The Findings and Purposes section of the earlier Measure P was retained as codified in City's municipal code section 18.78.010.[1] Section 18.78.070.A prohibits City from applying to LAFCO or otherwise requesting or supporting the addition of any land to its urban service area "until such time as the city council finds that the amount of undeveloped, residentially developable land within the existing urban service area is insufficient to accommodate five years' worth of residential growth . . . ." Section 18.78.070.B allows City to expand its urban service area by addition of "desirable infill," but only if City finds "that the expansion would not unduly burden city services and that the expansion would beneficially affect the general welfare of the citizens of the city . . . ."

The Density Restriction is contained in section 18.78.070.D. It provides in full: "In order to assure that city services and resources are not unduly burdened, urban sprawl and noncontiguous development must be discouraged. Therefor, for any land added to the urban service area between March 1, 1990, and the effective date of Measure P, December 8, 1990, and not considered infill as defined in subsection B of this section, the city shall not provide urban services to support any development at a higher density than that provided for in the Santa Clara County general plan as of March 1, 1990."

### III. PROCEDURAL BACKGROUND

Arcadia did not challenge Measure P but after Measure C was passed in 2004 Arcadia decided to sue. Arcadia filed this lawsuit against City and the Morgan Hill City Council (collectively, City), seeking damages and writ relief. The writ petition (the first cause of action) alleged that the 10-year extension of the Density Restriction was a prejudicial abuse of the police power that imposed an arbitrary and unreasonable condition upon the development of Arcadia's property and was, in effect, illegal spot zoning. The second cause of action was for inverse condemnation. The third and fourth causes of action sought damages for denial of equal protection (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a)) and violation of civil rights (42 U.S.C. §§ 1983, 1988). The trial court dismissed the action, finding it was barred by the statute of limitations. (Gov. Code, § 65009.) We reversed that ruling in *Arcadia Development Co. v. City of Morgan Hill* (2008) 169 Cal.App.4th 253, 268–269 [86 Cal.Rptr.3d 598].

---

[1] Further unspecified section references are to City's municipal code.

Following our decision in the first appeal, Arcadia's writ petition and the liability portion of its equal protection claim were tried to the court. The trial court found that City had a rational basis for limiting development on the property, which it set forth in the resolution approving submission of the measure to the voters. Specifically, the trial court held: "[I]n this instance, we have a resolution of the City that sets out the extensive process that the City underwent in making the determinations, as to not only the Density Restriction, but as to the other changes made to the prior Measure P. [Citation.] This resolution, under the 'Urban Service Area Restrictions' section [citation], provided that the continued restriction as to the Arcadia property was kept in place '[i]n order to assure the City services and resources are not unduly burdened, urban sprawl and noncontiguous development must be discouraged.' " The court also concluded that, given the size of the property and its "being connected on two sides by agricultural lands with minimum 20-acre lot sizes," the Density Restriction did not create an illegal spot zone.

The trial court's decision was dispositive of all but the cause of action for inverse condemnation. The parties stipulated to dismissal of that cause of action, without prejudice, and judgment was entered in favor of City on the remaining claims. This timely appeal followed.

## IV. Discussion

### A. *Contentions and Standard of Review*

Arcadia argues, as it did below, that the 10-year extension of the Density Restriction is an arbitrary and discriminatory exercise of City's police power and violates its right to equal protection of the law. Since the pertinent facts are undisputed, we review the trial court's resolution of these issues under the independent standard of review. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 836 [102 Cal.Rptr.2d 719, 14 P.3d 930]; *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 874 [64 Cal.Rptr.2d 447, 937 P.2d 1350].) Our independent review of the ordinance is guided by settled principles.

■ Equal protection of the law means that persons who are similarly situated with respect to a law must be treated alike under the law. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a); *Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 857 [99 Cal.Rptr.3d 503].) But depending upon the circumstances, differential treatment can be constitutionally valid. "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational

basis for the classification. [Citations.] Where there are 'plausible reasons' for [the government] action, 'our inquiry is at an end.' [Citation.] This standard of review is a paradigm of judicial restraint. 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' " (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313–314 [124 L.Ed.2d 211, 113 S.Ct. 2096]; see also *Warden v. State Bar* (1999) 21 Cal.4th 628, 645 [88 Cal.Rptr.2d 283, 982 P.2d 154].) "In other words, the plaintiff must show that the difference in treatment was ' "so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational." ' " (*Las Lomas, supra,* at p. 859, quoting *Gregory v. Ashcroft* (1991) 501 U.S. 452, 471 [115 L.Ed.2d 410, 111 S.Ct. 2395].)

■  Although Arcadia's argument is that the ordinance violates equal protection because it applies only to the Arcadia property, the argument is not an as-applied challenge. It is a facial challenge because the alleged defect is the ordinance itself. To succeed in a facial challenge, "the plaintiff has a heavy burden to show the statute is unconstitutional in all or most cases, and ' "cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute." ' (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 39 [124 Cal.Rptr.2d 701, 53 P.3d 119].)" (*Coffman Specialties, Inc. v. Department of Transportation* (2009) 176 Cal.App.4th 1135, 1144–1145 [98 Cal.Rptr.3d 643].)

Typically, a facial challenge to the validity of an ordinance requires the court to consider only the text of the ordinance, not its application to the particular circumstances of an individual. (*County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 337 [93 Cal.Rptr.3d 39].) Although the text of the Density Restriction does not mention the Arcadia property by name, the parties' arguments on appeal analyze the issue as if it does. Since there is no dispute that the Arcadia property is the only property subject to the Density Restriction,[2] we shall accept that the ordinance singles out the Arcadia property for differential treatment.

---

[2] City asserted at oral argument that there is one other property to which the Density Restriction could apply if that property owner were to seek a change in zoning. For all practical purposes, however, it is undisputed that the Arcadia property is now and has always been the only property subject to the Density Restriction. The Density Restriction effectively makes Arcadia a class of one. Under present circumstances, the class-of-one rational basis analysis is the same as that applied in classic equal protection cases. (*Village of Willowbrook v. Olech* (2000) 528 U.S. 562, 564 [145 L.Ed.2d 1060, 120 S.Ct. 1073].)

■ Arcadia's alternative argument is that the Density Restriction is an abuse of City's police power. City's exercise of its constitutionally derived police power is subject to substantial deference from the judicial branch. (*Reynolds v. Barrett* (1938) 12 Cal.2d 244, 250 [83 P.2d 29].) A land use ordinance is a valid exercise of the police power if it bears a substantial and reasonable relationship to the public welfare. (*Arnel Development Co. v. City of Costa Mesa* (1981) 126 Cal.App.3d 330, 336–337 [178 Cal.Rptr. 723] (*Arnel*).) It is invalid only if it is arbitrary, discriminatory, and bears no reasonable relationship to a legitimate public interest. (*Ibid.*)

## B. *Spot Zoning*

■ We begin our analysis by considering one theme that runs throughout Arcadia's briefs, which is that City abused its police power by spot zoning the Arcadia property. Spot zoning is one type of discriminatory zoning ordinance. (*Wilkins v. City of San Bernardino* (1946) 29 Cal.2d 332, 340–341 [175 P.2d 542].) "Spot zoning occurs where a small parcel is restricted and given lesser rights than the surrounding property, as where a lot in the center of a business or commercial district is limited to uses for residential purposes thereby creating an 'island' in the middle of a larger area devoted to other uses. [Citation.] Usually spot zoning involves a small parcel of land, the larger the property the more difficult it is to sustain an allegation of spot zoning. [Citations.] Likewise, where the 'spot' is not an island but is connected on some sides to a like zone the allegation of spot zoning is more difficult to establish since lines must be drawn at some point. [Citation.] Even where a small island is created in the midst of less restrictive zoning, the zoning may be upheld where rational reason in the public benefit exists for such a classification." (*Viso v. State of California* (1979) 92 Cal.App.3d 15, 22 [154 Cal.Rptr. 580].)

*Hamer v. Town of Ross* (1963) 59 Cal.2d 776 [31 Cal.Rptr. 335, 382 P.2d 375], is a spot zoning case. In *Hamer*, the plaintiff owned a 2.2-acre parcel zoned for single-family homes with a minimum lot size of one acre. The parcel was bounded on three sides by single-family homes on lots much smaller than an acre; the fourth side bordered a hospital. (*Id.* at p. 780.) The plaintiff wanted to build apartments on her lot but the city rejected her rezoning petition. The Supreme Court upheld the city's single-family-home restriction but struck down the one-acre minimum. (*Id.* at pp. 790–791.) The plaintiff's parcel was "virtually surrounded" by smaller parcels. (*Id.* at p. 778.) The plaintiff's lot was "an 'island' of one-acre minimum lot size zoning in a residential ocean of substantially less restrictive zoning." (*Id.* at p. 782.) Thus, the one-acre limitation was "unreasonable, oppressive and unwarranted." (*Id.* at p. 781.)

This case is nothing like *Hamer*. The Arcadia property is not a small parcel. It is nearly 70 acres in size. And it is not surrounded by property with less restrictive zoning designations. There is development on two sides of the property but the land on the other two sides is rural agricultural, just like the Arcadia property. That configuration was the same in 2004 as it was in 1990. Accordingly, the 2004 decision did not create or perpetuate an unlawful spot of zoning.

Arcadia maintains that, in rejecting the spot zoning argument, the trial court improperly took into account the rural county lands because those lands are not within City's jurisdiction. But the nature of the county land is relevant to the spot zoning inquiry because those lands border the subject property. The trial court quite properly considered the nature of all the land surrounding the Arcadia property in concluding that there was no spot zoning.

### C. *Relationship of the Density Restriction to the Public Welfare*

Although the Density Restriction does not result in classic spot zoning, in order to be a legitimate exercise of the police power the ordinance must bear a reasonable relationship to the public welfare and may not be arbitrary or discriminatory. (*Arnel, supra*, 126 Cal.App.3d at pp. 336–337.) Arcadia's equal protection argument calls for the same analysis. The core issue is whether there is any rational reason related to the public welfare for the restriction imposed. (See *Ursack, Inc. v. Sierra Interagency Black Bear Group* (9th Cir. 2011) 639 F.3d 949, 958 [noting that "rational basis" and "arbitrary and capricious" standards of review are identical].)

Arcadia relies upon *Arnel* in arguing that the Density Restriction unfairly discriminates against its property. In *Arnel*, the City of Costa Mesa rezoned a 46-acre parcel for the express purpose of allowing a large residential development and apartment complex. (*Arnel, supra*, 126 Cal.App.3d at pp. 333–334.) Shortly after the city approved the project a citizens' group mounted a successful initiative rezoning the property to single-family residential. (*Id.* at p. 334.) *Arnel* struck down the initiative ordinance as not rationally related to the public welfare. The *Arnel* court observed that the initiative ordinance was adopted 16 months after the city had completed an extensive process that led to the determination of the appropriate zoning for the property. The initiative rezoned the property, "without evidence of any significant change in conditions or circumstances and for the sole and specific purpose of defeating the Arnel development." (*Id.* at p. 335.)

Arcadia maintains that, as in *Arnel*, the ordinance at issue here was motivated by local citizens who did not want the Arcadia property developed.

But *Arnel* considered motive only because it found no other purpose for the ordinance. The ultimate issue was whether the ordinance was substantially related to the public welfare. The public welfare inquiry " 'should begin by asking whose welfare must the ordinance serve.' " (*Arnel, supra*, 126 Cal.App.3d at p. 338, italics omitted, quoting *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 607 [135 Cal.Rptr. 41, 557 P.2d 473].) The court must then identify competing interests and, finally, decide " 'whether the ordinance, in light of its probable impact, represents a reasonable accommodation of the competing interests.' " (*Arnel, supra*, at p. 339.) *Arnel* found that there was an acute shortage of low- and moderate-income housing in the region, the proposed apartment complex was a matter of regional concern, and the initiative's rezoning made no attempt to accommodate this competing concern. (*Id.* at p. 338.) The initiative was "not rationally related to the general regional public welfare, but, at best, to conserving the interests of the adjoining property owners and residents of the immediate area." (*Id.* at p. 337.)

In the case before us, the express public welfare concern is the concededly legitimate goal of minimizing the burden on City resources by discouraging noncontiguous development and urban sprawl. An additional legitimate goal set forth in the RDCS is maintaining City's unique rural character. (See *Breneric Associates v. City of Del Mar* (1998) 69 Cal.App.4th 166, 176 [81 Cal.Rptr.2d 324] [regulating development to preserve a city's scenic or aesthetic character "is a substantial and legitimate governmental interest"].) The Density Restriction advances both goals by effectively freezing City's urban service boundaries where they were drawn prior to March 1, 1990, thereby halting urban sprawl and minimizing the potential that adjacent farmland will be urbanized.

Arcadia argues that there is no rational basis for distinguishing its property from all other noninfill parcels presently within City's urban service area. But the size and location of the Arcadia property are attributes shared by no other parcel. (See *Kawaoka v. City of Arroyo Grande* (9th Cir. 1994) 17 F.3d 1227, 1240.) The Arcadia property is among the largest undeveloped parcels within City's urban service area and it lies at City's southern edge, approximately two miles from City's central core, abutted on two sides by rural county land. Development of a 70-acre parcel would demand more of City's resources than would development of a smaller parcel. Development of the Arcadia property would require extending City services farther than would development of parcels closer to the center of town. And, as LAFCO's 1989 EIR warned, permitting Arcadia to compete for development of its property has the potential of pushing development deeper into the surrounding agricultural areas. Indeed, the public interest concerns that prompted the enactment of the Density Restriction in 1990 persisted through 2004. City was still concerned about controlling and directing growth. And, although City had not added any

noninfill land since 1990, it still had over 1,000 acres of residentially developable land available. Thus, prohibiting development of the Arcadia property for another 10 years is plausibly and rationally related to the public interests of halting urban sprawl and maintaining City's rural character. The only competing interest is Arcadia's. That interest is implicitly accommodated by the fact that the Density Restriction will be subject to reevaluation when Measure C expires in 2020. This is in contrast to *Arnel*, in which the voter initiative actually rezoned the land, completely ignoring the public interest and favoring only the private interests of adjoining landowners. (*Arnel, supra*, 126 Cal.App.3d at p. 338.)

*Fry v. City of Hayward* (N.D.Cal. 1988) 701 F.Supp. 179, upon which Arcadia relies, is distinguishable. *Fry* involved a 108-acre parcel that was subject to an initiative measure prohibiting any change in its open space zoning designation without prior voter approval. (*Id.* at p. 180.) As in this case, the ordinance affected only the plaintiff's property. (*Ibid.*) The district court found that the subject property was no different from other open space parcels throughout the city and that the city had "failed to offer even a theoretical reason for treating the Fry property separately." (*Id.* at p. 182.) Thus, in *Fry*, any open space parcel would advance a goal of preserving open space. Here, City's concern with sprawl and with maintaining its rural ambiance incorporates a concern with the *direction* of growth. The Arcadia property is necessarily different in this regard than other large parcels located elsewhere in the City.

Arcadia argues that development of its property would not contribute to sprawl, pointing to the 1989 EIR, which states that development of the Arcadia property would be a logical extension of the existing development on the property's northern and eastern borders. The argument ignores the parallel concern cited in the EIR, which was that development of the Arcadia property could increase the pressure to develop the farmland to its west and south.

■ Arcadia also argues that it is unfair to restrict development upon its parcel when there are other parcels upon which City has allowed development, some of which are farther from City's central core than its property, some of which are located adjacent to county land, and some of which are "similar" in size to the Arcadia property. City has undoubtedly permitted the development of other parcels. Under the RDCS, City may allow some developments to go forward and it may reject others based upon the RDCS formula. City is entitled to regulate development in this way. (See, e.g., *Breneric Associates v. City of Del Mar, supra*, 69 Cal.App.4th at p. 176 [a city may reject proposed developments if it determines the projects would detract from its goal of preserving the scenic character of the community].) Indeed, zoning and other land use decisions necessarily involve drawing a

line somewhere. (*Wilkins v. City of San Bernardino, supra*, 29 Cal.2d at p. 341.) The legislative body, not the courts, must decide where the boundary is to be placed and such a decision is not subject to judicial interference unless there is no reasonable basis for it. (*Ibid.*)

Finally, Arcadia argues that the Density Restriction prohibits development only upon land annexed during a finite nine-month period in 1990, which means that if City were to add other noninfill parcels to its urban service area in the future the Density Restriction would not apply to them. City does not directly respond to the argument, pointing out that it has not added any noninfill since 1990. City seems to assume that it will not be adding any new, noninfill parcels prior to the expiration of Measure C. Indeed, the plain intent of both Measure P and Measure C was to freeze City's urban service area at its March 1, 1990 borders and to concentrate future development within that area. The problem, as Arcadia sees it, is that the annexation prohibition dissolves when City's supply of residentially developable land has dwindled to less than a five-year supply but there is no provision dissolving the Density Restriction at that point. Thus, Measure C leaves open the possibility that City could add new noninfill parcels and allow them to compete for housing allotments under their general plan zoning designation while the Density Restriction would continue to exclude the Arcadia property from that process.

The foregoing hypothetical scenario does not make the Density Restriction invalid. First, the scenario is unlikely to arise. At an estimated absorption rate of 50 acres per year, City's 2004 inventory of 1,056 acres would not dip below a five-year supply until right around 2020, when all of Measure C will expire. Second, even if City were to add new noninfill parcels during the life of Measure C, the addition would not inevitably invalidate the Density Restriction. The continuing validity of the Density Restriction would depend upon the nature of the newly added land, the development restrictions City might impose upon it, and any number of other circumstances we cannot predict in advance. That is, hypothetical circumstances surrounding the possible future application of the ordinance do not present a fatal conflict with the governing legal principles.

## V. CONCLUSION

■ We conclude that the Density Restriction, which limits residential development of the Arcadia property to one dwelling unit per 20 acres, is not an arbitrary or discriminatory exercise of City's police power or a violation of Arcadia's right to equal protection. Given the size of the property and its location on the southern edge of City adjacent to large swaths of unincorporated agricultural land, restricting development on the property for the 10 years between 2010 and 2020 bears a substantial and reasonable relationship

to the public welfare goals of limiting the burden on City services and resources, discouraging noncontiguous development and urban sprawl, and maintaining City's unique rural character.

## VI.  DISPOSITION

The judgment is affirmed. Defendants are entitled to their costs on appeal.

Rushing, P. J., and Elia, J., concurred.