[No. B230436. Second Dist., Div. Eight. July 3, 2012.]

420 CAREGIVERS, LLC, et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES, Defendant and Appellant.

**[ORDERED PARTIALLY PUBLISHED\*]**

\*Reporter's Note: This opinion, filed for publication July 3, 2012, and modified July 19, 2012, was granted review September 19, 2012, S204684. On July 31, 2013, review was dismissed and the cause remanded. On September 25, 2013, the Supreme Court ordered partial publication of the Court of Appeal's opinion as modified (the modification is incorporated herein). Part III. of the Discussion, originally published by the Court of Appeal, is consistent with, but has since been superseded by, *City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729 [156 Cal.Rptr.3d 409, 300 P.3d 494]. To avoid confusion, part III. has therefore not been ordered republished by the Supreme Court. "The Supreme Court may . . . order publication of an opinion, in whole or in part, at any time after granting review." (Cal. Rules of Court, rule 8.1105(e)(2).)

1318

COUNSEL

Carmen A. Trutanich, City Attorney, Jane E. Usher, Assistant City Attorney, Steven Blau, Colleen M. Courtney and Charles D. Sewell, Deputy City Attorneys, for Defendant and Appellant.

Best Best & Krieger, Jeffrey V. Dunn and Lee Ann Meyer for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant.

DIR Welch Attorneys at Law, David R. Welch; Norris & Galanter and Douglas F. Galanter for Plaintiffs and Respondents 420 Caregivers, LLC, 420 Collective, 420 Highway Pharmacy Inc., American Sobriety Inc., Buddha Bar Collective, Compassionate Caregivers of San Pedro, Exclusive Caregivers of California Inc., Galaxy Caregivers Group LLC, Green Joy Inc., Green Leaf Collective, Healers on 3rd Inc., Herbal Medicine Care Inc., Herbal Remedies Caregivers Inc., The Hills Caregivers, Holistic Cannabis Collective, JEG Inc., Wilshire Medical Marijuana Collective, Medical Wellness Center Inc., Medical Marijuana Collective, Natural Ways Always, Nature's Wonder Caregivers Group Inc., The Shop at Greenbush, Starbudz, Stargate Collective Medical Marijuana & Collective, Sunset Junction Organic Medicine Medical Marijuana Collective, Trinity Holistic Caregivers Inc., Valley Holistic Caregivers Inc., 818 NPO, A-1 Organic Collective, AKH LLC, Always 420, American Eagle Collective II, BB Collective Inc., Buds on Melrose, California

Organic Collective, Green Horizon Collective, Green Secret Garden, Herbal Health Resource Center, House of Kush, HTA Happenings, Le Peu, Love & Spirit Care Center Inc., Organic Healing Center Inc., Sunland Organic Pharmacy, Sunny Day Collective, NPO, Liberty Bell Temple II Inc., Helping Hint Caregivers, Herbal Love Caregivers on the Boulevard, Hollywood's Compassionate Caregivers, Infinity Philanthropy Global, LAHC 3 Collective, Pacoima Recovery Collective Inc., Royal Herb Merchant, T.L.P.C., Traditional Herbal Center Inc. Collective Caregivers, Universal Caregivers Inc., West Valley Caregivers, Westwood Organics, Metal Horns, Inc., Los Angeles Community Collective, Better Alternative Treatment, Montana Caregivers Inc., G Art Gallery Collective Inc., Venice Alternative Healing Collective, Van Nuys Health Clinic, Private Organic Therapy, Advanced Pain Solutions, Herbal Medicine for You, Inc., Green Magic Collective, Best Quality Herbal Medicine, Inc., HCC—Herbal Compassionate Caregiver, Inc., and Green Dot Medicinal Cannabis Patients Group.

Law Offices of Stanley H. Kimmel, Stanley H. Kimmel and Alison Minet Adams for Plaintiffs and Respondents Melrose Quality Pain Relief, Inc., Abdul Ahmed, Robina Bashir, Herbalology Inc., Sean Cardillo, Safe Life Caregivers, Josean Posey, New Era Caregivers, Maz Gilardian, Kush Korner V, Inc., Peter Pietrangelia, God's Gift, Andrew Kang, Downtown Natural Caregivers, Yun Kang, The Meds Merchant, Inc., South Bay Wellness Network, Relief Corp Inc., Healthy Herbal Care, Inc., and Herbal Nutrition Inc.

Kumin Sommers, Matthew W. Kumin, Ramsey Hanafi; and Alison Minet Adams for Plaintiffs and Respondents Kevin Anderson, Laron J. Clarke III, Earl Stein, Sandra Mallut, Rafael Carrera Oliva, Dennis Nichols, Donna Henderson, Carlos Cisneros, Kimberly Tornero, Michael Helfin, Shirley Eberle and John Conroy.

## OPINION

**SORTINO, J.**[*]—Appellant in this case is the City of Los Angeles (City). Respondents are various collectives and individual members of collectives (Collectives) currently engaged in the cultivation, distribution, or use of medical marijuana within City limits.[1] In the court below, the Collectives

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] The City filed both opening and reply briefs. Three respondents' briefs were filed: one on behalf of numerous collectives, the lead collective being 420 Caregivers, LLC (420 Caregivers et al.); one on behalf of numerous collectives, the lead collective being Melrose Quality Pain Relief, Inc. (Melrose et al.); and one on behalf of numerous individual members of collectives, the lead individual being Kevin Anderson (Anderson et al.). The League of California Cities

filed various separate lawsuits seeking to enjoin enforcement of City ordinance No. 181,069 (Ordinance), passed by the Los Angeles City Council (City Council) on January 26, 2010, and approved by the mayor on February 3, 2010. The Ordinance regulates the number and geographic distribution of medical marijuana collectives within City limits. It also imposes a number of other regulations on the operation of medical marijuana collectives within City limits.

The trial court consolidated the various separate lawsuits and, after multiple hearings, preliminarily enjoined enforcement of portions of the Ordinance on the following grounds: (1) violation of the federal right to equal protection; (2) preemption by state law; (3) violation of the state right to due process; and (4) violation of the state right to privacy. The City now appeals from the trial court's preliminary injunction.

For the reasons that follow, and based upon considerable guidance received from cases decided, and a statute enacted, after the trial court rendered its decision, we reverse the trial court's order granting the request for a preliminary injunction. We remand this case for further proceedings consistent with this opinion.

## STATUTORY AND PROCEDURAL BACKGROUND

Both the trial court's order and the issues raised in this appeal involve the interplay of various state and local laws, enacted at different times since 1996. Accordingly, a lengthy statutory and procedural background follows.

### 1. *The Compassionate Use Act*

In 1996, California voters approved Proposition 215, known as the Compassionate Use Act of 1996 (CUA), which is codified in Health and Safety Code section 11362.5. The CUA provides that no physician shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes. (§ 11362.5, subd. (c).) The CUA also immunizes specific persons from specific prosecutions under the Health and Safety Code: "[Health and Safety Code] [s]ection 11357, relating to the possession of marijuana, and [s]ection 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5, subd. (d).) The CUA defines "primary caregiver" as the person designated by

and the California State Association of Counties requested permission to file a joint amicus curiae brief in support of the City. We previously granted leave to file the amicus curiae brief. Melrose et al. filed a response to the amicus curiae brief. We have reviewed and considered all of the above mentioned briefs in reaching this decision.

the patient "who has consistently assumed responsibility for the [patient's] housing, health, or safety." (Health & Saf. Code, § 11362.5, subd. (e).)

Significantly, for purposes of this case, the CUA also provides that "[n]othing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes." (Health & Saf. Code, § 11362.5, subd. (b)(2).) It also expressly "encourage[s] the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana." (§ 11362.5, subd. (b)(1)(C).)

### 2. *The Medical Marijuana Program Act*

In 2003, the California Legislature enacted the Medical Marijuana Program Act (MMPA), codified in Health and Safety Code sections 11362.7 through 11362.83. The MMPA was passed, in part, to clarify the scope of the CUA and promote its uniform application "among the counties within the state." (Stats. 2003, ch. 875, § 1, p. 6422.)

To accomplish these goals, the MMPA empowers the State Department of Health Care Services to create a voluntary program for the issuance of identification cards to "qualified patients." (Health & Saf. Code, § 11362.71, subd. (a)(1).) "Qualified patients" are defined as those persons "entitled to the protections" of the CUA. (§ 11362.7, subd. (f).)

The MMPA then grants immunity from prosecution to an expanded list of offenses so long as the underlying conduct involves medical marijuana use: "Subject to the requirements of this article, the individuals specified in subdivision (b) shall not be subject, *on that sole basis*, to criminal liability under [Health and Safety Code] [s]ection[s] 11357 [(possession)], 11358 [(cultivation)], 11359 [(possession for sale)], 11360 [(sales)], 11366 [(maintaining a place)], 11366.5 [(providing a place)], or 11570 [(nuisance)]." (Health & Saf. Code, § 11362.765, subd. (a), italics added.) The individuals to whom this immunity applies are expanded beyond the patients and primary caregivers protected by the predecessor CUA: the MMPA grants immunity to (1) qualified patients, persons with identification cards, and the primary caregivers of such persons; (2) individuals who provide assistance to persons in these three groups in administering medical marijuana; and (3) individuals who provide assistance to persons in these three groups in acquiring the skills necessary to cultivate or administer medical marijuana. (Health & Saf. Code, § 11362.765, subd. (b).)

Significantly, the MMPA also expressly extends immunity to the same enumerated Health and Safety Code sections for additional, "collective,"

conduct: "Qualified patients, persons with valid identification cards, and the designated primary caregivers of qualified patients and persons with identification cards, who *associate* within the State of California in order *collectively or cooperatively* to cultivate marijuana for medical purposes, shall not *solely on the basis* of that fact be subject to state criminal sanctions under [s]ection[s] 11357, 11358, 11359, 11360, 11366, 11366.5, or 11570 [of the Health and Safety Code]." (§ 11362.775, italics added.)

The MMPA, as originally enacted, also affirmatively provided that "[n]othing in this article shall prevent a city or other local governing body from adopting and enforcing laws consistent with this article." (Stats. 2003, ch. 875, § 2, p. 6424 [Health & Saf. Code, former § 11362.83].) More importantly, during the pendency of this appeal, that section was amended to read, in full: "Nothing in this article shall prevent a city or other local governing body from adopting and enforcing any of the following: [¶] (a) Adopting local ordinances that regulate the location, operation, or establishment of a medical marijuana cooperative or collective. [¶] (b) *The civil and criminal enforcement of local ordinances described in subdivision (a).* [¶] (c) Enacting other laws consistent with this article." (Health & Saf. Code, § 11362.83, italics added.)

### 3. *The City's Interim Control Ordinance*

In response to citizen complaints and law enforcement concerns about the proliferation of storefront medical marijuana dispensaries within City limits, the City Council passed Interim Control ordinance No. 179,027 (ICO) on August 1, 2007, and the mayor approved it on August 10, 2007. The ICO went into effect September 14, 2007.[2]

For a period of one year from its effective date or until adoption of a permanent ordinance, whichever came first, the ICO prohibited the establishment or operation of a medical marijuana *dispensary* within the City limits. The ICO defined a medical marijuana dispensary as any facility or location that "distributes, transmits, gives, dispenses, facilitates or otherwise provides

---

[2] The court below and the parties seem to agree, either expressly or impliedly, that the ICO became effective September 14, 2007. No one, though, expressly articulates how this date was determined. This court's own research discloses the following. Los Angeles City Charter, article II, section 250, subdivisions (b) and (c) require mayoral approval of ordinances passed by the City Council or, where the mayor vetoes, an override of that veto by the City Council. Section 251 requires an ordinance "finally adopted under the provisions of the Charter" to be published either once in a daily newspaper circulated in the City or as otherwise authorized by the ordinance. Finally, section 252 provides that nonurgency ordinances take effect 31 days after their publication. At oral argument, the City provided the citation to the appendix on appeal which shows that the ICO was published on August 14, 2007. September 14, 2007, was the 31st day after publication and thus the effective date of the ICO.

marijuana in any manner, in accordance with [s]tate law, in particular, California Health and Safety Code [s]ections 11362.5 through 11362.83 [(the CUA and the MMPA)], inclusive." The ICO, however, also created one large exception to the general prohibition of dispensaries: any dispensary established before September 14, 2007 (the effective date of the ICO), and operated in accordance with state law would be allowed to continue so long as it filed various specified documents with the city clerk within 60 days of "the adoption" of the ICO.[3] The parties, as well as the court below, seem to agree that the 60th day was November 13, 2007.[4]

The ICO also allowed up to two 180-day extensions of its prohibition so long as the City Council found that the various agencies responsible for investigation relevant to a permanent ordinance were exercising due diligence. Subsequently, the City Council enacted both of the available 180-day extensions. On June 19, 2009, the City Council passed an entirely new ordinance, Interim Control ordinance No. 180,749, which amended the ICO and extended its prohibitions to March 15, 2010, or the enactment of a permanent ordinance, whichever came first.

Approximately 187 "dispensaries" registered on or before November 13, 2007, pursuant to the ICO. Over 30 of these "dispensaries" expressly identified themselves in their names as either a medical marijuana "collective" or "cooperative." Over 30 more expressly utilized the plural term "caregivers" in their names, implicitly suggesting collective associations of primary caregivers.

---

[3] The ICO identifies the required documents as (1) a form to be designated by the city clerk, (2) a City tax registration certificate, (3) a state Board of Equalization seller's permit, (4) the property lease, (5) proof of business insurance, (6) dispensary membership forms and, if required, (7) a county health permit.

[4] The ICO expressly states that dispensaries in operation before its "effective" date are exempt so long as they file the requisite paperwork within 60 days of its "adoption." A literal interpretation of this language would suggest that dispensaries in existence prior to September 14, the effective date of the statute, would be exempt so long as they filed the requisite paperwork within 60 days of either August 1, the day the City Council passed the ICO, or August 10, the day the mayor approved it, whichever event legally constitutes its "adoption." This literal interpretation of the ICO's language, though, would mean the 60-day period for registration began before the statute was ever published, and therefore before it was legally effective, which is an unreasonable construction. Following generally accepted rules of statutory construction, this court finds that the City Council intended the registration period to begin the date the ICO became effective and inadvertently chose imprecise language. (See *People v. Mendoza* (2000) 23 Cal.4th 896, 908 [98 Cal.Rptr.2d 431, 4 P.3d 265] [courts should avoid statutory construction that would produce "absurd consequences" not intended by the Legislature].)

### 4. *The City's Permanent Ordinance*

On January 26, 2010, the City Council passed the Ordinance, which added article 5.1 (L.A. Mun. Code, § 45.19.6 et seq.) to chapter IV of the Los Angeles Municipal Code.[5] The mayor approved the Ordinance on February 3, 2010. The Ordinance went into effect June 7, 2010, after approval of a final fee schedule.[6]

Prior to enactment of the Ordinance, the City Council and City planning and land use management committee (Planning Committee) conducted at least 16 public hearings regarding the community impact of entities engaged in the distribution of medical marijuana. The hearings involved testimony from members of the public, including medical marijuana patients, the owners and operators of entities engaged in the cultivation and distribution of medical marijuana, and residents living near these entities. These hearings also included testimony from high-ranking members of the Los Angeles Police Department. Evidence presented to the City Council and the Planning Committee showed both an explosive increase in the number of entities dispensing medical marijuana and a significant increase in crime and citizen complaints involving those entities. It also showed that some of these entities were diverting marijuana to uses not authorized by the CUA or MMPA. Finally, it showed that scarce law enforcement resources were often diverted to criminal investigations involving these entities.

As a result, the City Council enacted the Ordinance for the express purpose of protecting the health, safety, and welfare of the City residents by regulating the collective cultivation of medical marijuana inside City limits. (§ 45.19.6.) To achieve this goal, the Ordinance requires all "[m]edical marijuana *collectives*" to comply with its provisions. (*Ibid.*, italics added.) It defines "medical marijuana collectives" as incorporated or unincorporated associations of four or more qualified patients, persons with identification cards, or primary caregivers, who collectively or cooperatively associate at a given location to cultivate medical marijuana in accordance with the CUA and MMPA. (§ 45.19.6.1, subd. B.)

---

[5] All undesignated section references to the Los Angeles Municipal Code are to provisions of the Ordinance as passed by the City Council on January 26, 2010, unless otherwise noted. Such references do not include any subsequent amendments to the Ordinance.

[6] Both the City and 420 Caregivers et al. seem to agree that June 7, 2010, was the effective date of the Ordinance, and the trial court so found. Again, however, the parties do not articulate how that June 7 date was determined. Based upon the reasoning and authorities discussed above in footnote 2, *ante*, a June 7 effective date seems consistent with the date the final fee ordinance was approved by the mayor, assuming the required publication of that ordinance occurred within reasonable due course. Accordingly, we uphold the trial court's finding of June 7, 2010, as the effective date of the Ordinance.

The Ordinance requires all medical marijuana collectives to submit to a new registration and approval process to continue operation. (§ 45.19.6.2, subd. A.) Subject to an exception discussed below, the Ordinance caps the total number of allowable collectives at 70, to be distributed proportionally around the City's various neighborhoods according to population densities as mapped by the Planning Committee. (§ 45.19.6.2, subd. B.1.)

Initially, the only collectives eligible to register under the Ordinance are those that (1) previously registered on or before November 13, 2007, in compliance with the ICO; (2) have operated continuously at their registered location since on or before September 14, 2007 (the effective date of the ICO), or both moved once in response to a federal enforcement letter and sought a hardship exemption under the ICO; (3) continue to have the same ownership and management as that identified in their City registration documents; (4) have not been cited for nuisance or public safety violations of state or local law; and (5) are currently at or designate a new location that meets new Ordinance requirements regarding distances from other collectives, schools, parks, libraries, and other specified sensitive uses. (§§ 45.19.6.2, subd. B.2, 45.19.6.3, subd. A.2.) To the extent the total number of initially eligible collectives exceeds 70, they nevertheless remain eligible and are to be allocated proportionally throughout the City based upon the population densities in the various neighborhoods as determined by the Planning Committee. (§ 45.19.6.2, subd. B.2.) All potentially eligible collectives were to notify the City of their intent to register at a designated location within one week of the Ordinance's effective date. (§ 45.19.6.2, subd. C.1.) The City decided to give priority to collectives that had registered under the ICO because they had already shown a willingness to be openly compliant with and regulated by the law.

The Ordinance requires all other collectives to cease operation immediately. (§ 45.19.6.7.) It does, however, allow other collectives not currently eligible to register to participate in a future lottery for the opportunity to register should the total number of operating collectives ever fall below 70. (§ 45.19.6.2, subd. C.2.) The Ordinance sunsets after two years unless extended by the City Council and, if not extended, all collectives must cease operation. (§ 45.19.6.10.) Violations of the Ordinance are punishable as misdemeanors. The Ordinance may also be enforced through nuisance abatement proceedings. (§ 45.19.6.9; L.A. Mun. Code, § 11.00, subd. (m).)

Collectives that register with and ultimately obtain permission to operate from the City pursuant to the Ordinance must maintain certain records: (1) the names, addresses, and phone numbers of all members engaged in management of the collective; (2) the names, addresses and phone numbers of all patient members to whom the collective provides marijuana; (3) copies

of the patient members' MMPA identification cards or doctors' recommendations; (4) the names, addresses, and phone numbers of all primary caregiver members to whom the collective provides marijuana; and (5) copies of the primary caregivers' MMPA identification cards or their qualified patients' written designations. (§ 45.19.6.4.) The collective must maintain these records for five years and must make them available to the Los Angeles Police Department upon demand. (*Ibid.*)

The above notwithstanding, the Ordinance expressly states that "private medical records" may not be obtained by the police absent an otherwise valid warrant, court order, or subpoena. (§ 45.19.6.4.) The Ordinance defines a "private medical record" as documentation of the qualified patient's or identification cardholder's medical history other than a physician's recommendation, the actual MMPA identification card, or the written designation of a primary caregiver by a qualified patient or identification cardholder. (§ 45.19.6.1, subd. B.)

Collectives not eligible under the Ordinance because they had not previously registered under the ICO were sent letters by the city attorney advising them that they were or would be in violation of the Ordinance and that continued operation might result in criminal prosecution.

### 5. *The Trial Court's Injunction*

Beginning in March 2010, the Collectives began filing lawsuits seeking to enjoin enforcement of the Ordinance. The multiple lawsuits were eventually consolidated before one trial court. On December 10, 2010, after extensive hearings, the trial court preliminarily enjoined enforcement of portions of the Ordinance.

The trial court based its injunction on a number of legal conclusions: (1) the Ordinance violates federal equal protection because it requires eligible collectives to have previously registered under the ICO, which, despite its terms, expired by operation of law nearly 60 days before the end of the registration period; (2) the Ordinance's sunset and penal provisions are preempted by the MMPA; (3) the Ordinance violates state procedural due process because it requires collectives that did not register under the ICO to cease operation immediately without the benefit of a hearing; and (4) the Ordinance's recordkeeping and record disclosure requirements violate the state right to privacy.

### 6. *Litigation and Legislation Since the Injunction*

On January 10, 2011, the trial court required the Collectives to post a bond in the amount of $348,102 pursuant to Code of Civil Procedure section 529.

On January 13, 2011, the court requested additional briefing on the bond issue and stayed the injunction pending resolution of the bond issue. To date, the bond issue has not been resolved and the trial court's stay of the injunction remains in effect.

On January 21, 2011, the City Council passed temporary urgency ordinance No. 181,530 (TUO) and the mayor approved it on January 25, 2011. The TUO amends the Ordinance, purportedly to resolve the defects in it as found by the trial court. By its terms, it remains in effect only until the preliminary injunction is reversed on appeal or permanent amendments to the Ordinance are enacted.[7]

## DISCUSSION

### I. *Review of Preliminary Injunction: Applicable Legal Standards*

■ When deciding whether to issue a preliminary injunction, a trial court weighs two interrelated factors: (1) the likelihood the moving party will prevail on the merits and (2) the relative interim harm to the parties from issuing or not issuing the injunction. (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999 [90 Cal.Rptr.2d 236, 987 P.2d 705].)

On appeal, factual findings made by the trial court must be accepted if supported by substantial evidence. (*County of Los Angeles v. Hill* (2011) 192 Cal.App.4th 861, 867 [121 Cal.Rptr.3d 722] (*Hill*).) Ordinarily, the decision to issue a preliminary injunction is reviewed for an abuse of discretion. (*City of Corona v. Naulls* (2008) 166 Cal.App.4th 418, 427 [83 Cal.Rptr.3d 1].) Whether a local ordinance is unconstitutional or preempted, however, is a question of law subject to de novo review. (*Hill, supra,* at p. 867; *City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153, 1168 [100 Cal.Rptr.3d 1] (*Kruse*); see *Arcadia Development Co. v. City of Morgan Hill* (2011) 197 Cal.App.4th 1526, 1534 [129 Cal.Rptr.3d 369] (*Arcadia Development*) [where pertinent facts are not in dispute, appellate review is de novo].)

### II. *Equal Protection*

#### A. *The Trial Court's Opinion*

As stated above, to be eligible to register under the Ordinance, a collective must have previously registered under the ICO on or before November 13,

---

[7] In their respondents' brief, Melrose et al. argue that the bond-related stay and the enactment of the TUO render the City's appeal moot and/or premature, and for that reason the appeal should be dismissed. These issues were already resolved by this court's denial of Melrose's separate motion to dismiss the appeal and will not be addressed again in this opinion.

2007. To be eligible to register under the ICO, a collective must have been in existence prior to September 14, 2007, the effective date of the ICO. In the court below, the City argued that prior registration under the ICO is a reasonable way to determine preference: past compliance with the ICO shows a willingness to follow the law, which in turn is a good predictor of law-abiding behavior going forward.

The trial court disagreed. It found the Ordinance's requirement of previous registration under the ICO to be arbitrary. The trial court concluded, therefore, that the Ordinance violates equal protection.

The trial court reasoned as follows. The City Council passed the ICO on August 1, 2007. The ICO, despite its express initial term of one year, expired by operation of law 45 days later on September 15, 2007. To reach this finding, the trial court relied upon Government Code section 65858, subdivision (a), which provides that local interim zoning ordinances, such as the ICO, automatically expire 45 days after their "adoption," unless extended after a noticed public hearing. Since no such noticed public hearing occurred in this case, the trial court concluded that the ICO necessarily expired on September 15, 2007, one day after its effective date of September 14, 2007, and only one day into the 60-day registration period which it authorized.

The trial court then opined—hypothetically—that an otherwise law-abiding collective able to register under the express terms of the ICO, might have declined to do so because of its belief that the ICO expired as of September 15, 2007. A failure to register under the ICO, then, was not necessarily a refusal to follow the law, but possibly only a recognition that the law was no longer valid. Thus, the trial court reasoned, a collective's failure to register under the ICO did not necessarily mean that it was less likely to follow the law in the future. Accordingly, the trial court concluded, the requirement violated federal principles of equal protection.

Before we evaluate the trial court's ruling, it is important to frame properly the issues before this court. The relevant issue is not the constitutionality or even the nonconstitutional legality of the ICO per se. The issue is the constitutionality of the Ordinance insofar as it requires prior compliance with the ICO.

Second, the trial court did *not* find the Ordinance unconstitutional *as applied*: it did not find—and apparently no evidence was presented—that any particular collective prohibited from registering under the Ordinance because of noncompliance with the ICO was in fact eligible to register under the ICO but chose not to for any reason, let alone out of a belief that the ICO had already expired. The trial court based its decision entirely on the hypothetical

existence of a collective or group of collectives that could have registered under the express terms of the ICO but chose not to because of a belief that the ICO had already expired by operation of law. Thus, although it did not expressly so state, the trial court's ruling that the Ordinance violates equal protection is necessarily a ruling *on the face* of the Ordinance and not on the Ordinance as applied.

In their briefs to this court, the Collectives likewise do not contend that any of them actually fit within this category theorized by the trial court. Thus, the equal protection challenge to the Ordinance remains facial rather than as applied.[8]

## B. *Applicable Law*

■ With the issues thus framed, we review the applicable law. Equal protection under the law means that parties similarly situated with respect to a law must be treated alike under the law. (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 857 [99 Cal.Rptr.3d 503] (*Las Lomas*); see U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) That does not mean, however, that differential treatment is always unconstitutional. Where a statute makes distinctions involving inherently suspect classifications or fundamental rights, it is subject to "strict scrutiny" and may be upheld only if the *government* establishes the distinction is necessary to achieve a compelling state interest. (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 480 [97 Cal.Rptr.2d 334, 2 P.3d 581] (*Kasler*).) Most legislation, however, is reviewed only to determine whether the challenged classification bears a rational relationship to a legitimate state interest. (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200 [39 Cal.Rptr.3d 821, 129 P.3d 29] (*Hofsheier*).) In areas

---

[8] At oral argument, the City and 420 Caregivers et al. agreed that the equal protection challenge is to the face of the Ordinance. Melrose, on its own behalf, argued that its challenge is both facial and as applied since the City had closed it due to noncompliance with the Ordinance. At oral argument, Melrose cited to its July 26, 2010 ex parte application for a temporary restraining order, which the trial court ultimately denied, as providing a factual basis for its as-applied challenge. We have reviewed the application and supporting declarations, as well as the City's opposition and supporting declarations. The application, opposition, and various declarations describe a July 20, 2010 police undercover marijuana purchase and subsequent search warrant execution at Melrose's place of business. Pursuant to the warrant, officers seized small amounts of marijuana and cash. The officers also cited those at the location to appear in court, based upon an alleged violation of the Ordinance. Notwithstanding this citation for an Ordinance violation, a review of the record cited above shows that the investigation was based on facts which led the Los Angeles Police Department to believe that Melrose was distributing marijuana not to collective members, but to third parties for cash. Such conduct, if true, is a felony violation of the Health and Safety Code not subject to the immunity provisions of either the CUA or the MMPA. In any event, the incident and conduct described above do not establish, as a factual matter, that Melrose could have registered under the ICO but chose not to because of a belief that the ICO had expired. It therefore does not make its equal protection claim an as-applied challenge.

of social or economic policy not involving suspect classifications or fundamental rights, a statute must be upheld so long as there is any reasonably conceivable set of facts that provides a "rational basis" for the classification. (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313 [124 L.Ed.2d 211, 113 S.Ct. 2096] (*FCC*); accord, *Las Lomas, supra,* at p. 858.)

■ Moreover, in those cases *not* involving suspect classifications or fundamental rights, it is the *party challenging the statute* who must demonstrate that the difference in treatment is unrelated to the achievement of any legitimate government purpose. (*Kasler, supra,* 23 Cal.4th at p. 480.) This means that the challenging party must essentially negate every conceivable legitimate basis which might support the statutory classification. (*FCC, supra,* 508 U.S. at p. 315.) Because a legislative body is not required to articulate its reasons for enacting a statute, whether the conceived reason supporting the statute actually motivated the legislative body is entirely irrelevant for constitutional purposes. (*Ibid.; Hofsheier, supra,* 37 Cal.4th at p. 1201.) "In other words, a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." (*FCC, supra,* at p. 315.) Under the rational basis test, a strong presumption favors the validity of the challenged statute. (*Id.* at p. 314; see *Kasler, supra,* at p. 480.)

■ The United States Supreme Court has articulated why such deference is paid to statutes which do not affect suspect classifications or fundamental rights: "This standard of review is a paradigm of judicial restraint. 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' [Citation.]" (*FCC, supra,* 508 U.S. at p. 314; see *Las Lomas, supra,* 177 Cal.App.4th at p. 858.)

■ When evaluating a facial constitutional challenge, the court considers only the text of the statute itself, not its application to the particular circumstances of an individual party. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) The California Supreme Court has not articulated a single standard for determining the validity of a facial challenge. (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 39 [124 Cal.Rptr.2d 701, 53 P.3d 119] (*Zuckerman*); *Coffman Specialties, Inc. v. Department of Transportation* (2009) 176 Cal.App.4th 1135, 1145 [98 Cal.Rptr.3d 643] (*Coffman*).) Under the more strict test, the party challenging the statute must establish that it " 'inevitably pose[s] a present total and fatal conflict with applicable constitutional prohibitions.' [Citation.]" (*Guardianship of Ann. S.* (2009) 45 Cal.4th 1110, 1126 [90 Cal.Rptr.3d 701, 202 P.3d 1089]; accord, *Coffman, supra,* at

p. 1145.) Under the more lenient test, the challenging party must establish that the statute is unconstitutional " 'in the generality or great majority of cases.' [Citations.]" (*Guardianship of Ann S., supra*, at pp. 1126–1127, italics omitted; accord, *Coffman, supra*, at p. 1145; see *Arcadia Development, supra*, 197 Cal.App.4th at p. 1535 [challenging party must show the statute unconstitutional " 'in all or most cases' "].) Under either test, the challenging party bears a heavy burden and " ' "cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute." ' [Citation.]" (*Coffman, supra*, at p. 1145; accord, *Arcadia Development, supra*, at p. 1535; see *Zuckerman, supra*, at p. 39.)

We need not decide which test articulated by the Supreme Court is applicable in this case. Since we find, as will be discussed below, that the Collectives have not met their burden even under the more lenient standard, we need not discuss application of the stricter test. (See *Guardianship of Ann S., supra*, 45 Cal.4th at p. 1126.)

### C. *Legal Analysis*

The Ordinance makes distinctions involving neither fundamental rights nor suspect classifications. It therefore must be analyzed under the rational basis test described above.

Insofar as it incorporates the requirement of prior registration under the ICO, the Ordinance essentially prohibits collectives that began operating on or after September 14, 2007, since they could not have registered pursuant to the ICO. It essentially allows those collectives in existence prior to September 14, 2007, so long as they also completed formal registration under the ICO. As such, the Ordinance is essentially a "grandfather provision" with the added gloss of a prior registration requirement. So-called "grandfather provisions" have routinely withstood equal protection challenges, both at the federal and state levels.

■ In *New Orleans v. Dukes* (1976) 427 U.S. 297 [49 L.Ed.2d 511, 96 S.Ct. 2513] (*Dukes*), the City of New Orleans banned all pushcart food vendors from the French Quarter who had not been operating for at least eight years prior to January 1, 1972. (*Id.* at p. 298.) Dukes, who had operated within the French Quarter for only two years prior to the cutoff date, challenged the ordinance on equal protection grounds. (*Id.* at pp. 298–299.) The trial court granted the city's motion for summary judgment. The appellate court reversed. (*Id.* at p. 299.)

The Supreme Court reversed the decision of the appellate court and upheld the ordinance. The court first observed that in the area of local economic

regulation which does not implicate fundamental rights or suspect classifications, the courts do "not sit as a superlegislature [*sic*] to judge the wisdom or desirability of legislative policy determinations." (*Dukes, supra,* 427 U.S. at p. 303.) In such areas of local concern, the court noted, "it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with [principles of equal protection]." (*Id.* at pp. 303–304.)

The court went on to find that the ordinance's classification furthered the city's purpose of preserving the historic ambience of the French Quarter and encouraging the tourist economy. The city council could reasonably conclude that "street peddlers and hawkers" interfered with the charm of the French Quarter and thus might discourage tourism if not "substantially curtailed" or "totally banned." (*Dukes, supra,* 427 U.S. at pp. 304–305.) The use of a "grandfather provision," banning some vendors but allowing others, was neither irrational nor arbitrary:

"But rather than proceeding by the immediate and absolute abolition of all pushcart food vendors, the city could rationally choose initially to eliminate vendors of more recent vintage. This gradual approach to the problem is not constitutionally impermissible. The governing constitutional principle was stated in *Katzenbach* v. *Morgan* [(1966) 384 U.S. 641, 657 [16 L.Ed.2d 828, 86 S.Ct. 1717]]: '[W]e are guided by the familiar principles that a "statute is not invalid under the Constitution because it might have gone farther than it did," [citation], that a legislature need not "strike at all evils at the same time," [citation], and that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," [citation].'

"The city could reasonably decide that newer businesses were less likely to have built up substantial reliance interests in continued operation in the [French Quarter] and that the two vendors who qualified under the 'grandfather clause'—both of whom had operated in the area for over 20 years rather than only eight—had themselves become part of the distinctive character and charm that distinguishes the [French Quarter]. We cannot say that these judgments so lack rationality that they constitute a constitutionally impermissible denial of equal protection." (*Dukes, supra,* 427 U.S. at p. 305.)

Similarly, in *Martinet* v. *Department of Fish & Game* (1988) 203 Cal.App.3d 791, 794 [250 Cal.Rptr. 7] (*Martinet*), the Court of Appeal rejected an equal protection challenge to a state law that limited the number of shark and swordfish permits issued to new applicants but did not limit the number issued to prior permittees, so long as the prior permittees also fulfilled other conditions not pertinent here. In its decision, the court summarized the controlling law: "An economic regulation creating classifications

with some reasonable basis does not result in denial of equal protection simply because the classifications are mathematically imprecise or because their application results in some inequality. [Citation.] A law which favors existing businesses over new ones will be upheld if there is any reasonable and substantial justification for the distinction. [Citation.] The person challenging such a classification has the burden of proving it is arbitrary and without reasonable foundation. [Citation.] '[I]f any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.' [Citation.]" (*Martinet, supra,* 203 Cal.App.3d at p. 794.)

■ Applying that law to the facts before it, the court further found a rational basis for the legislation at issue: "The members of this class of prior permittees . . . may reasonably be assumed to rely on the limited fishery for their livelihood. The possibility this differentiation may not be exact does not render the statutes unconstitutional. Nor may Martinet successfully claim the statutes are invalid because they protect shark and swordfish from overfishing by new entrants but not prior permittees. [¶] The Legislature may adopt economic regulations 'that only partially ameliorate a perceived evil.' [Citation.] [¶] The statutes are reasonably drawn to protect against overfishing, while also protecting the fishing industry and those persons who have invested in and practiced drift gill net fishing of shark and swordfish in the past . . . ." (*Martinet, supra,* 203 Cal.App.3d at p. 795, quoting *Dukes, supra,* 427 U.S. at p. 303.)

It is clear, based on the authorities discussed above, that had the Ordinance simply chosen September 14, 2007, as the date prior to which collectives eligible under the Ordinance had to exist, the statute would have passed constitutional muster. The City, as of the date it passed the Ordinance, would have been able to articulate a rational relationship between the classification and a legitimate government interest: (1) the proliferation of crime associated with the increased number of medical marijuana collectives, coupled with the police department's limited resources, require that the number of collectives be restricted and their operations regulated; (2) those collectives in existence prior to September 14, 2007, and that have continued to operate from that time in a lawful manner have an over-two-year track record that is a valid predictor of law-abiding behavior going forward; and (3) they should therefore be given preference over post-September 14 collectives.

The trial court found the cases above inapplicable because rather than simply set September 14, 2007, as the date prior to which an eligible collective had to exist, the Ordinance instead required registration under the ICO. This registration requirement established September 14, 2007, as the de facto cutoff date, but the ICO's lapse, as found by the trial court, created a

potential class of collectives whose failure to register theoretically did not indicate an unwillingness to follow the law.[9]

 The hypothetical possibility that some excluded collectives refused to register based not on an inclination towards lawlessness but on a belief that the law had expired, although theoretically "unfair" to some, does not violate equal protection. It bears repeating that "[a]n economic regulation creating classifications with some reasonable basis does not result in denial of equal protection simply because the classifications are mathematically imprecise or because their application results in some inequality." (*Martinet, supra,* 203 Cal.App.3d at p. 794; see *Dukes, supra,* 427 U.S. at pp. 303, 306.) Whether or not it expired before its stated term because of Government Code section 65858, the ICO was a facially valid local ordinance, duly enacted by a legitimate legislative body with authority generally to legislate in the area. Approximately 187 medical marijuana entities, over 60 of which expressly or implicitly by their names alone indicated they were collective associations, chose to comply with the ICO and register, pursuant to its express terms, on or before November 13, 2007. Their willingness to follow this duly enacted ordinance, whatever its ultimate legality as subsequently determined in a court of law, provided the City with a rational basis to conclude that they would continue to act in a law-abiding manner going forward. That a theoretical class of collectives excluded under the Ordinance might similarly act in a law-abiding fashion, though perhaps "unfair" on some level, does not violate equal protection: "Defining the class of persons subject to a regulatory requirement—much like classifying government beneficiaries—'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.' [Citation.]" (*FCC, supra,* 508 U.S. at pp. 315–316; accord, *Warden v. State Bar* (1999) 21 Cal.4th 628, 645 [88 Cal.Rptr.2d 283, 982 P.2d 154].)

---

[9] In its equal protection argument, the City points out that it is a charter city and argues that the ICO did not lapse because Government Code section 65858, subdivision (a), does not apply to a charter city. The City alternatively argues that even if section 65858 applies, Government Code section 65010, subdivision (b), saves the ICO because (1) the City's failure to properly set or extend the term of the ICO was a procedural error only and (2) section 65010 requires a plaintiff to establish prejudice before invalidating a local ordinance based upon procedural errors. The Collectives counter by arguing that the City waived its charter city argument because it did not raise it below. Alternatively, the Collectives contend that section 65858 does apply to charter cities when enacting zoning ordinances such as the ICO and that section 65010 cannot save the ICO because the error was substantive, not procedural. We do not reach these arguments involving the interplay between local zoning ordinances and the Government Code because, based upon the analysis above, it is not necessary to do so.

Moreover, even if the unfairness to this theoretical class of collectives arguably implicates equal protection, the Collectives still have not demonstrated an equal protection violation. The Ordinance's requirement of prior registration under the ICO essentially differentiates medical marijuana collectives into three separate groups: (1) those in existence *prior* to September 14, 2007, who were therefore *eligible* to register under the ICO and *who did so* on or before November 13, 2007; (2) those in existence *prior* to September 14, 2007, who were therefore *eligible* to register under the ICO but *who chose not to*; and (3) those in existence *on or after* September 14, 2007, who were therefore *ineligible* to register under the ICO. The members of group 1 are eligible to register under the Ordinance, and thus potentially eligible to continue collective cultivation of medical marijuana as defined by the Ordinance, while those in groups 2 and 3 are not.

Since this is a facial constitutional challenge, the Collectives, as discussed earlier, bear the heavy burden of demonstrating the Ordinance unconstitutional " 'in the generality or great majority of cases.' [Citations.]" (*Guardianship of Ann S., supra*, 45 Cal.4th at pp. 1126–1127, italics omitted; see *Coffman, supra*, 176 Cal.App.4th at p. 1145.) This the Collectives have not done. Based upon *FCC*, *Dukes*, and *Martinet* the exclusion of group 3 by a grandfather provision does not violate equal protection under the rational basis test. Even if we assume for the purpose of argument that unfairness to group 2 somehow implicates equal protection concerns—and we expressly refuse to so find, as discussed above—the Collectives have not demonstrated that this class, or a single collective that would fit within this class, even exists. Approximately 187 medical marijuana entities in existence prior to September 14, 2007, registered under the ICO. Based upon the record before us, we find the existence of group 2, or even a single collective that would fit within group 2, to be no more than a theoretical possibility. Such a theoretical possibility of unconstitutional effect, as discussed earlier, is insufficient to demonstrate an equal protection violation based on a facial challenge. (*Zuckerman, supra*, 29 Cal.4th at p. 39; *Arcadia Development, supra*, 197 Cal.App.4th at p. 1535.)

Finally, we address one other issue related to the equal protection challenge. As discussed earlier, the ICO, by its terms, applied to "medical marijuana dispensar[ies]," as defined therein, while the Ordinance, by its terms, applies to " 'medical marijuana collective[s],' " as defined therein (boldface & capitalization omitted). Thus, the ICO required *dispensaries* to register while the Ordinance requires *collectives* to have previously registered under the ICO. In their brief to this court, Melrose et al. argue that this language discrepancy creates an equal protection violation: they contend that

the Ordinance is "irrational" because it requires "collectives" to have previously registered under an "expired" ordinance that pertained only to "dispensaries." We reject this contention for the reasons that follow.

First, it appears that no litigant raised this specific argument in the court below and it is therefore waived. (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846 [54 Cal.Rptr.2d 27].) We have reviewed the various points and authorities submitted to the trial court on constitutional issues relevant to the request for preliminary injunction and there is no mention, that we could find, of an equal protection violation based on this language discrepancy between the ICO and the Ordinance. That the parties below never raised it is supported by the fact that the trial court never mentions this issue in its opinion. In its opinion, the trial court routinely refers to "collectives" that registered under the ICO and "collectives" that did not. The trial court does not discuss the incongruous language of the two ordinances or whether that incongruity is material from an equal protection standpoint.

Second, the full extent of this equal protection argument by Melrose et al., insofar as they raise it in their brief to this court, is as described above. Though Melrose et al. repeat the argument in their brief, they do not expand upon or further analyze it in any material way. Nor do they support the argument with any specific citations to case authority. Such an argument, made only in conclusory form, may also be treated as waived. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].)

Third, we find this argument unpersuasive on the merits given the extremely broad definition of "dispensary" contained in the ICO: "[Medical marijuana dispensary] means any use, facility or location, including but not limited to a retail store, office building, or structure that distributes, transmits, gives, dispenses, facilitates or otherwise provides marijuana in any manner, in accordance with [s]tate law, in particular, California Health and Safety Code [s]ections 11362.5 through 11362.83, inclusive." Given the above definition, any collective, as later defined by the Ordinance, in existence at the time of the ICO, would or reasonably should have believed itself to be a "dispensary" subject to the registration requirements of the ICO. The ICO's definition of "dispensary" is simply too broad to conclude otherwise. This, of course, is borne out by the significant number of ICO registrants whose names alone either expressly or impliedly suggest collective associations. Therefore, we find any discrepancy between the two ordinances to be immaterial and thus insufficient to raise equal protection concerns.

Additionally, the trial court, as mentioned above, did not find that any individual litigant, eligible to register under the ICO, chose not to because it did not believe it was a "dispensary" as defined by the ICO. Further, we have

been directed to no evidence in the voluminous record which would support such a finding. Thus, there is no basis for an as-applied challenge on this ground. And, even if we were to find the discrepancy material in some way—which we expressly do not—the theoretical possibility that a collective might exist which believed itself not to fit within the ICO's definition of "dispensary" is simply too remote and too hypothetical to support a facial challenge.

Accordingly, we find no violation of equal protection by the Ordinance.

### III. *Preemption by State Law**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV. *Due Process*

#### A. *The Trial Court's Opinion*

Section 45.19.6.7 provides that any existing collective not in compliance with the requirements of the Ordinance must cease operation until such time, if any, that it comes into compliance. On May 4, 2010, the City sent letters to collectives that had not registered under the ICO and who were therefore ineligible to register under the Ordinance. The letters advised these collectives of the Ordinance's June 7, 2010 effective date, that they could not comply with the Ordinance and, therefore, that they must cease operation immediately. The letter also advised the collectives that continued operation might subject them to criminal misdemeanor penalties, civil penalties, injunctive relief, or revocation of any certificate of occupancy. In its opening paragraph, the letter characterized itself as a "courtesy notice" while the concluding sentence advised the collective to consult its attorney if it had any questions about the Ordinance.

The trial court found that the MMPA creates a statutory right to cultivate marijuana collectively for medical purposes. It further found that section 45.19.6.7, in conjunction with the May 4 letter, abrogates that right without a hearing or any other procedural protections. For that reason, the trial court concluded, the Ordinance violates procedural due process as required by the California Constitution.

---

*Reporter's Note: Part III. was not ordered published by the Supreme Court; see Reporter's Note, *ante*, page 1316.

## B. Applicable Law

■ Procedural due process, as required by the United States Constitution, protects only those matters which may be construed as liberty or property interests. (*Mathews v. Eldridge* (1976) 424 U.S. 319, 332 [47 L.Ed.2d 18, 96 S.Ct. 893]; *Board of Regents v. Roth* (1972) 408 U.S. 564, 569 [33 L.Ed.2d 548, 92 S.Ct. 2701]; *Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1059 [114 Cal.Rptr.2d 798].) Due process, as required by the California Constitution, is more expansive: its protections extend potentially to any statutorily conferred benefit, whether or not it can be properly construed as a liberty or property interest. (*People v. Ramirez* (1979) 25 Cal.3d 260, 263–264 [158 Cal.Rptr. 316, 599 P.2d 622].) When an individual is deprived of such a benefit, due process analysis under California law focuses not on the precise characterization of the benefit but simply on what process is constitutionally required given the governmental and private interests at issue. (*Ibid.*; *Ryan, supra*, at p. 1069.) California due process protections derive primarily from the individual's right to be free from arbitrary adjudicative procedures in and of themselves, regardless of the precise nature of the interest at stake. (See *Ramirez, supra*, at p. 267; *Ryan, supra*, at p. 1070.) Thus, when conducting this weighing of private and governmental interests to determine what process is due, courts should focus on procedural protections designed to promote accurate and reliable administrative decisions. (*Ramirez, supra*, at p. 267; *Ryan, supra*, at pp. 1069–1070.)

## C. Legal Analysis

■ As the above cases make clear, California due process protection, although more expansive than its federal counterpart, still requires the existence of some statutory benefit or entitlement before it is triggered. We find no such benefit or entitlement in this case which is in any way affected by the Ordinance. ■ As discussed above, the MMPA does not create a right collectively to cultivate medical marijuana. Although the CUA seems to encourage the Legislature to create such a right (Health & Saf. Code, § 11362.5, subd. (b)(1)(C)), it chose not to when enacting the MMPA and instead simply expanded the immunities initially created by the CUA to include additional state offenses and additional conduct that is collective or cooperative in nature. The MMPA creates no right or benefit, other than the right of certain specified persons to be free from prosecution for certain specified state offenses based upon certain specified conduct. The Ordinance in no way affects the availability of this limited immunity and thus does not abrogate any right or benefit created by the MMPA.

Furthermore, even if the MMPA could be construed to create some type of benefit or right affected by Ordinance section 45.19.6.7, there is no deprivation without due process. First, insofar as the trial court relied upon the May 4 letter as a basis for its due process ruling, that letter was sent only as a "courtesy," expressly advises collectives to consult with their attorneys and, most importantly, is not a part of or even authorized by the Ordinance. The *letter*, since not part of the statute's enforcement scheme, cannot serve as a basis for a ruling that the *Ordinance* violates California due process. It is nothing more than an advisory letter, which states the opinion of the City's chief prosecutor that the collective is or will be in violation of the Ordinance. It does not, and cannot, by itself enforce the Ordinance.

Additionally, section 45.19.6.7 does not, by any of its terms, create some type of summary or constitutionally deficient procedure for its enforcement. Like the balance of the Ordinance, section 45.19.6.7 relies instead on section 45.19.6.9 for enforcement. Section 45.19.6.9 provides: "Each and every violation of this article shall constitute a separate violation and shall be subject to all remedies and enforcement measures authorized by [s]ection 11.00 of this [c]ode. Additionally, as a nuisance per se, any violation of this article shall be subject to injunctive relief, revocation of the collective's registration, revocation of the certificate of occupancy for the location, disgorgement and payment to the City of any and all monies unlawfully obtained, costs of abatement, costs of investigation, attorney fees, and any other relief or remedy available at law or equity. The City may also pursue any and all remedies and actions available and applicable under local and state laws for any violations committed by the collective and persons related or associated with the collective."

 Los Angeles Municipal Code section 11.00 makes violations of the code continuing violations, subject to (1) punishment as misdemeanors or (2) civil penalties to à maximum of $2,500. (§ 11.00, subds. (*l*) & (m).) It also makes violations public nuisances subject to abatement by temporary restraining order, injunction, or any other order "issued by a court of competent jurisdiction." (§ 11.00, subd. (*l*).)

 As Los Angeles Municipal Code section 45.19.6.9 and section 11.00 make clear, section 45.19.6.7, like the balance of the Ordinance's provisions, is enforceable by the City only if the City commences formal legal proceedings—misdemeanor criminal prosecutions, nuisance actions, or civil suits—subject to all the procedural protections that full adversarial hearings provide. Section 45.19.6.7 does not provide for its own summary

administrative enforcement apart from ordinary lawsuits or criminal prosecutions and thus does not implicate due process concerns.

In this regard, *Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976 [4 Cal.Rptr.2d 837, 824 P.2d 643] (*Lusardi*) is instructive. In *Lusardi*, a private construction company (Lusardi) entered into a construction project with a public hospital district based upon the representation that the project was not a public work project for purposes of the prevailing wage law. (*Id.* at p. 983.) Midway through the project, the director of the state Department of Industrial Relations (Director) determined that the project was in fact a public work project and requested Lusardi's payroll records, presumably to ensure compliance with the prevailing wage law. (*Id.* at pp. 983–984.) A branch of the Department of Industrial Relations, the Division of Apprentice Standards, also requested records to ensure compliance with statutory apprenticeship requirements. (*Id.* at p. 984.) Both agencies threatened penalties if Lusardi did not comply. (*Ibid.*) Rather than comply, Lusardi ceased all work on the project and filed a lawsuit. (*Ibid.*) In its action, Lusardi argued, in part, that the Director's administrative decision to classify the construction as a public work project violated due process. (*Id.* at p. 990.)

The Supreme Court disagreed. The court observed that under the applicable statutory scheme, the Director had no authority to adjudicate formally whether a project is or is not a public work or, therefore, whether a contractor has or has not underpaid workers in violation of the prevailing wage law. (*Lusardi, supra*, 1 Cal.4th at p. 990.) The Director had only the authority to file a legal action alleging those facts so that a court could reach the ultimate decision. (*Ibid.*) The court characterized the Director's authority as "purely prosecutorial." (*Ibid.*) It further observed: "Thus, what the Director and his designees did in this case was to notify the [hospital] District and Lusardi that, in the view of the authorities, the project was a public work and the prevailing wage law applied. There is no statute requiring the Director to so notify an awarding body or contractor; apparently the Director did so in the hope that voluntary compliance could avoid the necessity to bring an action under [the prevailing wage law]. But before the Director could bring a court action to recover the amounts due under [the prevailing wage law], Lusardi sued the Director, claiming its due process rights were violated." (*Lusardi, supra*, 1 Cal.4th at p. 991.)

 After a review of the relevant case law, the court further concluded that the Director's initial determination did not violate due process: "Thus, the case law establishes that [persons] against whom criminal or civil charges

may be filed has no procedural due process right to notice and a hearing until and unless an executive branch official actually files formal civil or criminal charges." (*Lusardi, supra*, 1 Cal.4th at p. 992.) As if to remove any doubt, the court finally stated: "The Director's decision that a project is a public work may lead to further action that triggers due process rights. Should the [Department of Industrial Relations] seek to recover underpayments of the prevailing wage from Lusardi in a court action under [the prevailing wage law], Lusardi will be entitled to fully litigate the issue of its liability in the trial court. But at the time the Director's preliminary determination is made, no process is due." (*Lusardi, supra*, 1 Cal.4th at p. 993.)

From our perspective, there is no principled way to distinguish *Lusardi* from the immediate case. The May 4 letter, in our opinion, is nothing more than notification to the collectives involved that the City Attorney believed the collectives were or shortly would be in violation of the Ordinance. By itself, such a letter cannot enforce the Ordinance or deprive any collective of any statutory benefit. To enforce the Ordinance, the City is required to file either a civil or criminal lawsuit which, of course, will trigger the full adversarial protections provided any litigant in any court action.

Thus, we find no due process violation by the Ordinance.

V. *The Right to Privacy*

A. *The Trial Court's Opinion*

Section 45.19.6.4 describes the recordkeeping obligations of City-permitted collectives. It requires collectives to maintain, for a period of five years, various records, including the "full name, address and telephone number(s) of all patient members to whom the collective provides medical marijuana, a copy of a government-issued identification card for all patient members, and a copy of every attending physician's or doctor's recommendation or patient identification card." It additionally requires that all records, including the ones described particularly above, be made available by the collective to the Los Angeles Police Department "upon request." As mentioned earlier, however, section 45.19.6.4 also specifically exempts from this disclosure requirement "private medical records" of collective members. The police can demand such records only pursuant to an otherwise lawful search warrant, subpoena, or court order.

The trial court found that by allowing the police to obtain the general contact information of collective members (name, address, and telephone

number) upon request and without any additional procedural safeguards, the Ordinance violates the state constitutional right to privacy.[12]

### B. *Applicable Law*

 Article I, section 1 of the California Constitution guarantees, among, other things, a right to privacy: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." There are three elements of a privacy violation which a plaintiff must demonstrate: (1) the existence of a legally protected privacy interest; (2) a reasonable expectation of privacy under the circumstances; and (3) a serious invasion of that privacy interest. (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 39–40 [26 Cal.Rptr.2d 834, 865 P.2d 633] (*Hill v. NCAA*).) A defendant may prevail by negating any one of the above three elements or by asserting the affirmative defense that any invasion of privacy was justified by one or more legitimate but competing interests. (*Id.* at p. 40.) A plaintiff may rebut the showing of a competing interest by demonstrating the availability of feasible alternatives with a lesser impact on the privacy interest. (*Ibid.*)

In terms of the first element, legally protected privacy interests are generally of two categories: (1) interests in preventing the disclosure or misuse of sensitive information (informational privacy) and (2) interests in making intimate personal decisions or conducting personal activities without observation, intrusion, or interference (autonomy privacy). (*Hill v. NCAA, supra,* 7 Cal.4th at p. 35.) Informational privacy is the core value furthered by the Constitution's privacy clause. (*White v. Davis* (1975) 13 Cal.3d 757, 774 [120 Cal.Rptr. 94, 533 P.2d 222]; accord, *Hill v. NCAA,* at p. 35.) Privacy interests are not absolute and must be assessed separately and in context. (*Hill v. NCAA, supra,* at p. 35.) The immediate case involves only the issue of informational privacy.[13]

 With respect to the second element, the extent of a privacy interest is not independent of circumstances. (*Hill v. NCAA, supra,* 7 Cal.4th at p. 36.) Even when a legally cognizable privacy interest exists, circumstances may be present which affect whether an expectation of privacy remains reasonable.

---

[12] The Collectives raised a number of other privacy arguments with respect to other provisions of the Ordinance in the court below, all of which were rejected or found to be moot by the trial court. The Collectives failed to perfect their own appeal regarding these issues. We therefore have no jurisdiction to consider these additional privacy issues. (*In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119 [49 Cal.Rptr.2d 339].)

[13] Respondents raised the issue of autonomy privacy below, but the trial court rejected it. Because it has not been affirmatively raised on appeal, it is waived. (See fn. 12, *ante.*)

(*Ibid.*) Customs, practices, and physical settings surrounding particular activities may create or inhibit reasonable expectations of privacy. (*Ibid.*) "A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms." (*Id.* at p. 37.)

Because complete privacy does not exist in the modern world, actionable invasions of privacy, the third element of a privacy violation, "must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." (*Hill v. NCAA, supra,* 7 Cal.4th at p. 37.) The extent and gravity of the invasion is therefore indispensable when evaluating an alleged invasion of privacy. (*Ibid.*)

 Insofar as defenses are concerned, invasion of a privacy interest is not a constitutional violation if justified by a legitimate competing interest. (*Hill v. NCAA, supra,* 7 Cal.4th at p. 38.) "Legitimate interests derive from the legally authorized and socially beneficial activities of government and private entities." (*Ibid.*) Conduct which allegedly violates the right to privacy must be evaluated based upon the extent to which it furthers a legitimate and important competing interest. (*Ibid.*)

Whether a legally recognized privacy interest exists is a question of law subject to de novo review. (See *Hill v. NCAA, supra,* 7 Cal.4th at p. 40.) Whether the plaintiff has a reasonable expectation of privacy under the circumstances and whether a defendant's conduct is a sufficiently serious invasion of the right to find a violation are mixed questions of law and fact. (*Ibid.*) If undisputed material facts show no reasonable expectation of privacy or only an insubstantial impact on privacy interests, these issues may also be decided as questions of law. (*Ibid.*)

## C. *Legal Analysis*

This case raises the issue of *who* is asserting the privacy rights of *whom*: (1) whether collectives are asserting their own privacy rights; (2) whether collectives are asserting the privacy rights of their individual, human, members; or (3) whether individual members are asserting their own privacy rights. While it is beyond dispute that article I, section 1 of the California Constitution protects the privacy of *people*, it is not entirely clear to what extent legal entities *other than people* (1) may assert their own privacy rights based upon this provision or upon other sources or (2) may have standing to assert the privacy rights of people who are their members or with whom they

are otherwise involved. (See, e.g., *Connecticut Indemnity Co. v. Superior Court* (2000) 23 Cal.4th 807, 817 [98 Cal.Rptr.2d 221, 3 P.3d 868] [court assumes but does not decide that corporate *insureds* have privacy rights which may be asserted by their corporate *insurer*]; *Roberts v. Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 797 [195 Cal.Rptr. 393] [although corporation not protected by art. I, § 1 of the state Const., it may still have limited right to privacy dependent upon its "nexus" with human beings and "the context in which the controversy arises"]; see also *Hecht, Solberg, Robinson, Goldberg & Bagley LLP v. Superior Court* (2006) 137 Cal.App.4th 579, 594 [40 Cal.Rptr.3d 446] [same holding as *Roberts*]; *Ameri-Medical Corp. v. Workers' Comp. Appeals Bd.* (1996) 42 Cal.App.4th 1260, 1287–1288 [50 Cal.Rptr.2d 366] [same holding as *Roberts*].)

We need not decide these broad issues of entity privacy or the extent to which collective or cooperative entities may assert the privacy rights of their human members. We assume, without deciding, that both the collective and individual respondents in this case have certain privacy expectations in the records subject to disclosure under the Ordinance. Notwithstanding this assumption, the Ordinance does not violate any right to privacy. To the extent the respondents *as collectives* are asserting their own privacy rights, we find no issue with either the recordkeeping or disclosure requirements of the Ordinance given the heavily regulated area in which the collectives operate. Whether analyzed as creating an unreasonable expectation of privacy or an invasion of a reasonable expectation of privacy justified by a legitimate competing state interest, such entities are subject to greater privacy intrusions than would be allowed in the context of individuals or more ordinary businesses. Insofar as collectives are asserting the privacy rights of their *individual* members or, in the case of the Anderson et al. respondents, asserting their own *individual* privacy rights, we also find no invasion of privacy, based largely on similar analysis. Further, because the material facts are not in dispute, we address these issues essentially as questions of law subject to de novo review. (See *Hill v. NCAA, supra*, 7 Cal.4th at p. 40.)

██ Both the federal and state courts have long recognized that "closely regulated" businesses have a reduced expectation of privacy that relaxes the probable cause and warrant requirements ordinarily required for law enforcement searches. (E.g., *New York v. Burger* (1987) 482 U.S. 691, 702 [96 L.Ed.2d 601, 107 S.Ct. 2636] [automotive wrecking yards]; *Whalen v. Roe* (1977) 429 U.S. 589, 602 [51 L.Ed.2d 64, 97 S.Ct. 869] [pharmacies]; *People v. Doss* (1992) 4 Cal.App.4th 1585, 1598 [6 Cal.Rptr.2d 590] [pharmacies]; *People v. Paulson* (1990) 216 Cal.App.3d 1480, 1484 [265 Cal.Rptr. 579] [saloons]; *Fendrich v. Van de Kamp* (1986) 182 Cal.App.3d 246, 260

[227 Cal.Rptr. 262] [gambling establishments]; *Kim v. Dolch* (1985) 173 Cal.App.3d 736, 743 [219 Cal.Rptr. 248] [massage parlors]; *People v. Harbor Hut Restaurant* (1983) 147 Cal.App.3d 1151, 1156 [196 Cal.Rptr. 7] [wholesale fish industry].) This is so, at least in part, because of the strong government interest in regulating such businesses or industries. (See *New York v. Burger, supra,* at p. 700.)

Ordinary pharmacies dispensing traditional prescription drugs are closely regulated businesses. (*People v. Doss, supra,* 4 Cal.App.4th at p. 1598.) Consequently, they are required to maintain records of the type described by the Ordinance and present them to " 'authorized officers of the law' " without a warrant. (*Ibid.*; see Bus. & Prof. Code, §§ 4081, subd. (a), 4333, subd. (a).) We see no reason to accord marijuana collectives greater privacy with respect to the information at issue here. Marijuana collectives are engaged in the distribution of a substance, illegal under state law except as a basis for the prosecution of specified offenses under the specified conditions set forth in the CUA and the MMPA. Furthermore, marijuana is a schedule I controlled substance still *entirely illegal* under federal law. (*Ross, supra,* 42 Cal.4th at p. 926 [70 Cal.Rptr.3d 382, 174 P.3d 200]; see *Gonzales v. Raich* (2005) 545 U.S. 1, 14–15, 25–27 [162 L.Ed.2d 1, 125 S.Ct. 2195].)

The record below supports a finding that a number of so-called medical marijuana collectives are collectives in name only: rather than distribute marijuana to collective members for medical purposes, they instead sell marijuana to third parties for profit. The record also shows that the Los Angeles Police Department is forced to expend scarce resources to combat this criminal activity. Under these circumstances, it would be entirely irrational to accord marijuana collectives—as entities—greater privacy rights than pharmacies involved in the distribution and use of traditional prescription drugs. We find that any expectation of privacy by a collective in the limited, and nonintimate, information sought by the Ordinance to be unreasonable. Alternatively, and based on the same facts described above, we find any invasion of a reasonable expectation of privacy to be justified by a legitimate and competing state interest.

For similar reasons, we reach the same result with respect to any assertion of privacy rights by individual collective members or by collectives on behalf of their individual members. First, the information sought is extremely limited and nonintimate in nature: the name, address, and phone number of any given collective member. A member's medical records—which would contain significantly more personal and intimate information—cannot be obtained without a lawful warrant, subpoena, or court order.

Furthermore, statutes already allow the disclosure of patient contact information by traditional health care providers upon demand. Absent a formal written request by a patient to the contrary, ordinary health care providers may already release, upon request, contact information *and* a description of the reason for treatment, the general nature of the condition requiring treatment, and the general condition of the patient. (Civ. Code, § 56.16; see *Garrett v. Young* (2003) 109 Cal.App.4th 1393, 1406 [1 Cal.Rptr.3d 134].) Pharmacies are already required to make patient prescriptions—which themselves must contain patient contact information—available for inspection by "authorized officers of the law." (Bus. & Prof. Code, § 4333, subd. (a); see *id.*, § 4040, subd. (a)(1).) Insofar as schedules II, III, and IV controlled substances (drugs which may be *legally* prescribed) are concerned, pharmacies are already required weekly to provide the state Department of Justice with the names, addresses, and phone numbers of prescribed users. (Health & Saf. Code, § 11165, subd. (d)(1).) This information, in turn, may be given to state, local, or federal agencies for purposes of criminal or disciplinary investigations. (Health & Saf. Code, § 11165, subd. (c).)

In short, even where the privacy rights of individual collective members are concerned, the information sought is extremely limited and nonintimate in nature and the information—plus more—is typically already subject to disclosure in the context of more traditional health care treatments and providers. Again, for the same reasons as discussed above in connection with the rights of collectives as entities, we see no reason to give medical marijuana users greater privacy rights than patients utilizing more traditional health care providers and more traditional prescription drugs. Indeed, given the continued illegal nature of marijuana under most circumstances, even more substantial invasions of privacy would likely be justified under the current state of the law. Whether analyzed as an unreasonable expectation of privacy or a reasonably justified invasion of a reasonable expectation of privacy, we find no violation of the Collectives' members' individual privacy rights.

In its order, the trial court relied on *Board of Medical Quality Assurance v. Gherardini* (1979) 93 Cal.App.3d 669 [156 Cal.Rptr. 55], while Melrose et al., in their brief to this court, rely heavily on *Bearman v. Superior Court* (2004) 117 Cal.App.4th 463 [11 Cal.Rptr.3d 644]. We find neither case controlling in the immediate circumstances. Both cases dealt with the release of patients' actual medical records, not just contact information. (*Gherardini, supra*, at p. 673; *Bearman, supra*, at p. 466.) That situation is not presented by the immediate case.

## DISPOSITION

Based upon our resolution of the various questions presented by this appeal, respondents have not demonstrated a likelihood of prevailing on the merits at trial. The trial court's order granting the request for a preliminary injunction is therefore reversed. The case is remanded for further proceedings consistent with this opinion.

Appellant is awarded costs on appeal.

Bigelow, P. J., and Rubin, J., concurred.